Zel M. Fischer, Chief Justice
A jury found Joseph Perry guilty of one count of possession of a controlled substance. On appeal, he argues the circuit court erred in overruling his motions to suppress evidence and in sentencing him to eight years' imprisonment. The circuit court's judgment is affirmed.
Factual and Procedural History[1]
While on patrol, a police officer drove past Perry's house. She observed Perry backing his truck out of his driveway and began to follow him. While following him, the officer radioed dispatch to verify Perry's driving status. Based on a previous conversation with another officer, she believed Perry was driving with a suspended driver's license.[2] Dispatch was unable to give her a definitive answer to Perry's driving status before he pulled into the driveway of his fiancé's house. The officer stopped her vehicle in the street near the end of the driveway but did not block Perry's truck. She then approached Perry, and the following exchange took place, as recounted at the suppression hearing:
Prosecutor: What did you say first, exactly?
*296 Officer: ["]Hey, Joe, can I talk to you?" And then, "Joe, do you have a valid driver's license?"
Prosecutor: Okay, did Joe reply to you in any way?
Officer: He said, "Sure." And I asked if I could see his driver's license, and he got it out of his wallet. I do believe Joe did say that he was not suspended. 'Cause I said, "Joe, do you have a valid driver's license? I believe you're suspended?" And he goes, "I'm not suspended." And I said, "Well do you have your driver's license on you and can I see it?" he said, "Sure," and he reached in his back pocket and got it....
....
Prosecutor: [W]ould someone producing a valid license end your inquiry into suspicion?
Officer: Oh, no. Just because they hand me what looks to appear to be a valid license, I am still going to run it to check to make sure that it's valid.
Prosecutor: So did you have his license in your hand?
Officer: Yes. He gave me his license.
Prosecutor: And what did you do with it?
Officer: I was attempting to contact dispatch to run his LON, his driver's number, and I was unable to make any contact with dispatch on my handheld radio.
Prosecutor: And why were you unable to make contact with dispatch?
Officer: Come to find out later, I needed to change the antenna and the mike on my handheld; it was messed up and wasn't working.
Prosecutor: Were you-what were you doing then with that license?
Officer: Well at the time I was-I didn't realize that my radio was not working, so I was actually-I had my radio on, I was trying to run the information, dispatch was not getting back with me. I did not know that the transmission had not gone across, and that's when Mr. Perry started acting suspicious.
Prosecutor: Would you tell the Court exactly what that means, how was he acting suspicious?
Officer: Well, he got-he was like turning around from me, and he had put his hand in his pocket and he'd pulled out what appeared to be a plastic bag and he had it in his clenched fist. And I said, "Hey, Joe, come here for a minute." And he goes, "I got to get this bike out of the back of my truck." And with a clenched fist he reached up and grabbed this child's bike out of the back of the truck and then set it down. And I said, "Joe, come here for a minute." And he was like, he just kept ignoring me and kept trying to put distance between me and him. And then he walked around to the front of the vehicle, and I heard him say, "Hey, Norm, come get this." I followed him around the front of the truck, and he still had his hand clenched with the-and he was kind of like pushing the bike along, and then all of a sudden I said, "Joe, come here for a minute." He threw the bike down and took off running.
The officer pursued Perry on foot, ordering him to "stop running." When Perry came to a chain-link fence, he hesitated and bent his body over a fence post before climbing over it. After clearing the fence, Perry saw a sheriff's vehicle and surrendered himself. A plastic bag containing methamphetamine was found in a hollowed-out post where Perry climbed over the chain-link fence. Perry was charged with one count of possession of a controlled *297 substance with intent to distribute. Prior to trial, Perry moved to suppress the methamphetamine. The circuit court overruled his motions, and the jury found him guilty of the lesser-included offense of possession of a controlled substance.
At the sentencing hearing, when the circuit court asked for a recommended sentence, the prosecutor stated, "The range of punishment in this case enhanced to the B range is 5 to 15 years in the Department of Corrections." After the prosecutor recommend an eight-year sentence, the following colloquy occurred while reviewing the sentencing assessment report:
The Court: I did want to note one thing.... It looks like the offense says, possession of a controlled substance with intent to distribute. That is not what he was convicted of.
Prosecutor: It was not.
The Court: He was convicted of possession of a controlled substance.
Prosecutor: Correct.
The Court: But he has the enhanced range of penalties which are-
Prosecutor: It still is 5 to 15.
The Court:-5 to 15, it was just wrong on t[he offense]. Does that sounds [sic] right?
Defense Counsel: That's correct, Your Honor.
The circuit court sentenced Perry to eight years' imprisonment, the prosecutor's recommended sentence. Perry appealed, and after opinion by the court of appeals, this Court sustained transfer. Mo. Const. art. V, § 10.
Analysis
Perry first argues the circuit court erred in overruling his motions to suppress the methamphetamine because he was unlawfully seized when the officer requested his license without reasonable suspicion he was engaged in any criminal activity.
In reviewing a trial court's ruling on a motion to suppress, there must be substantial evidence to support the ruling. [T]he facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded.
In reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling. Deference is given to the trial court's superior opportunity to determine the credibility of witnesses. This Court gives deference to the trial court's factual findings but reviews questions of law de novo.[3 ]
Gaw , 285 S.W.3d at 319-20 (citations and internal quotation marks omitted). "At a hearing on a motion to suppress, the state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." State v. Grayson , 336 S.W.3d 138, 142 (Mo. banc 2011) (internal quotation marks omitted). The circuit court's ruling will be reversed only if it is clearly erroneous. Carrawell , 481 S.W.3d at 837.
Perry's argument raises the following issue: When a law enforcement officer requests that an individual produce a driver's license to verify whether he is driving on a suspended license-and he complies with the officer's request-has he been *298 "seized" pursuant to the Fourth Amendment to the United States Constitution?
"The Fourth Amendment protects the right of citizens to be free from unreasonable searches and seizures, and it applies to state actors through the Fourteenth Amendment. Article I, section 15 of the Missouri Constitution is coextensive with the Fourth Amendment; consequently, the same analysis applies under both provisions." State v. Lovelady , 432 S.W.3d 187, 190 (Mo. banc 2014) (internal citations and quotation marks omitted).
A "seizure" occurs "[o]nly when the officer, by means of physical force[4 ] or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio , 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if,[5 ] in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall , 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.... It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.
Hodari D. , 499 U.S. at 626, 111 S.Ct. 1547. "[T]he test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." Id. at 628, 111 S.Ct. 1547. Moreover, "where [physical force] is absent, submission to the assertion of authority" is also required to effect a seizure. Id. at 626, 111 S.Ct. 1547.
Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
Mendenhall , 446 U.S. at 554, 100 S.Ct. 1870. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." Id. at 555, 100 S.Ct. 1870.
Although the Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity, the Amendment is not implicated by a consensual encounter between an officer and a private citizen. "[F]or purposes of the Fourth Amendment, a seizure does not occur simply because a police officer approaches an individual and asks a few questions." State v. Lammers , 479 S.W.3d 624, 631 (Mo. banc 2016) (citing Florida v. Bostick , 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ). "If a reasonable person would feel free to disregard the police and go about their business, the *299 encounter is consensual and the Fourth Amendment is not triggered." Id.
Perry argues his encounter with the officer was not consensual primarily because he surrendered his license to her upon request. Without a license, he argues, a reasonable person is less likely to believe he can simply terminate a police encounter. But surrendering one's license to law enforcement does not necessarily amount to a seizure for Fourth Amendment purposes. Generally, "even when officers have no basis for suspecting a particular individual," police officers may ask questions of that individual or ask to examine the individual's identification "as long as the police do not convey a message that compliance with their requests is required." Bostick , 501 U.S. at 434-35, 111 S.Ct. 2382.
Indeed, the manner in which the officer requested to see Perry's license did not convey a message that his compliance was required. The officer's testimony at the suppression hearing indicates her requests for Perry's license were merely requests, not commands. See, e.g. , United States v. Drayton , 536 U.S. 194, 204, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). At the suppression hearing, the officer testified she did not activate the lights before she exited her vehicle. When she first approached Perry, she said, "Hey Joe, can I talk to you?" She then asked, "Joe, do you have a valid driver's license? I believe you're suspended." Perry responded he was not suspended. The officer then asked, "Well do you have your driver's license on you and can I see it?" Perry said, "Sure," reached into his back pocket, pulled out his license out of his wallet, and handed it to the officer. The record, therefore, reflects the officer did not demand Perry's license. Rather, she asked whether she could see it.
The fact Perry cooperated with the officer's request for his license did not terminate the consensual nature of their encounter nor did it establish he submitted to her authority. "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." Bostick , 501 U.S. at 439, 111 S.Ct. 2382. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." I.N.S. v. Delgado , 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Perry's voluntary cooperation with the officer's request, therefore, did not terminate the consensual nature of their encounter.
Perry focuses on the fact the officer informed him she believed his license was suspended, which made the encounter more coercive and thus nonconsensual. The officer did inform Perry she believed his license was suspended. This fact is merely one of many circumstances to consider in determining whether the encounter was consensual. Cf. id. ("Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.").
In requesting Perry's license, there was no application or overwhelming show of force, no intimidating movements, no brandishing of weapons, no blocking of exits, and no threats or commands. See Drayton , 536 U.S. at 204, 122 S.Ct. 2105 ("There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."). Immediately after handing the officer his license, Perry began acting suspiciously *300 by turning his back away from her, putting his hand in his pocket, pulling out a plastic bag, and holding it in a clenched fist. Only at this point did the officer issue the first of several commands ("come here for a minute"), but Perry "just kept ignoring [her] and kept trying to put distance between" the two. The officer once again commanded Perry to "come here for a minute," but he "threw the bike down and took off running." The officer pursued Perry on foot, ordering him to "stop running," another command Perry ignored. The officer had not finished checking his license and, therefore, did not have an opportunity to return it to Perry before his suspicious behavior commenced. This is consistent with the officer's testimony that Perry was free to leave until she observed him suspiciously taking the bag out of his pocket.
Given the totality of the circumstances, Perry's initial encounter with the officer when she requested his license was consensual in nature. When the officer actually required Perry to do something, he freely ignored her commands. At no point during the entire encounter did the officer seize Perry. Therefore, the Fourth Amendment was not implicated. See, e.g. , Mendenhall , 446 U.S. at 553, 100 S.Ct. 1870 ("Only when [restraint on a person's freedom of movement] is imposed is there any foundation whatever for invoking constitutional safeguards."); Lammers , 479 S.W.3d at 631. Accordingly, the circuit court did not err in overruling Perry's motions to suppress.
Perry next argues he was sentenced "under a materially false belief" regarding the applicable enhanced range of punishment because the circuit court "held the mistaken belief that the range of punishment" for Perry, as a persistent offender, was between five and 15 years' imprisonment when he "could have actually received a minimum sentence of up to one year in the county jail or incarceration in the Department of Corrections for a term less than five years." Perry is correct that the range of punishment was misstated at the sentencing hearing.
Perry was convicted of a class C felony and found to be a persistent offender. The ordinary range of punishment for a class C felony is one year in the county jail up to a maximum of seven years in the Department of Corrections, and five to 15 years in the Department of Corrections for a class B felony. Section 558.011.1(2), . 2, RSMo Supp. 2013. At the time of sentencing, only the maximum sentence increased for a persistent offender, while the minimum sentence was unaffected-e.g., a persistent offender convicted of a class C felony was subject to a range consisting of the minimum sentence for a class C felony and the maximum sentence for a class B felony. See § 558.016.7(3), RSMo Supp. 2013; see also, e.g. , State v. Cowan , 247 S.W.3d 617, 619 (Mo. App. W.D. 2008) (explaining the "statute only extends the maximum sentence but does not alter the minimum sentence"). As such, Perry was subject to a sentencing range of one year in the county jail to 15 years in the Department of Corrections, not a range of five to 15 years in the Department of Corrections.
Perry concedes this argument is not preserved for review because he failed to object at the sentencing hearing. Nevertheless, he requests this Court review his sentence for plain error. "Any issue that was not preserved at trial can only be reviewed for plain error, which requires a finding that manifest injustice or a miscarriage of justice has resulted from the trial court error." State v. Letica , 356 S.W.3d 157, 167 (Mo. banc 2011). "Relief under the plain error rule is granted only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice *301 inexorably results if left uncorrected." State v. Hadley , 815 S.W.2d 422, 423 (Mo. banc 1991). While the range of punishment was misstated at the sentencing hearing, Perry, who "bears the burden of establishing manifest injustice," as "determined by the facts and circumstances of the case," has failed to meet his burden. State v. Baxter , 204 S.W.3d 650, 652 (Mo. banc 2006).
"A sentence passed on the basis of a materially false foundation lacks due process of law and entitles the defendant to a reconsideration of the question of punishment in the light of the true facts, regardless of the eventual outcome." Wraggs v. State , 549 S.W.2d 881, 884 (Mo. banc 1977). As this Court explained in the companion case of State v. Pierce , No. SC96095, --- S.W.3d ---- (Mo. banc 2018), also handed down this date, under plain-error review, it is not enough for Perry to show the circuit court held a mistaken belief with respect to the range of punishment. Rather, Perry must establish the circuit court imposed the eight-year sentence based on that mistaken belief.
Perry has failed to establish the circuit court imposed sentence based on a mistaken belief. The circuit court did not sentence Perry to the misstated minimum sentence; instead, it sentenced him to an even longer sentence. Indeed, the eight-year sentence was precisely what the prosecutor recommended:
Your Honor, this case was originally charged as possession with intent with prior and persistent. He was facing 10 to life on that.
The jury found him guilty of the lesser included of the Class C felony of possession. It's methamphetamine. The defendant has several felonies in the past. The range of punishment in this case enhanced to the B range is 5 to 15 years in the Department of Corrections.
I believe that Mr. Perry's actions indicate that he's not a candidate for probation. His history indicates the same. And although I'm not asking for a maximum sentence either, there should be some benefit to winning part of the trial, which is that he didn't face a range of 10 to life. And so I am going to recommend that the Court impose a period of 8 years in the Department of Corrections and order that be executed.
Consistent with Pierce , Perry has failed to make a case-specific showing that he was sentenced based on the circuit court's mistaken belief. See Baxter , 204 S.W.3d at 652. Accordingly, the circuit court did not err in sentencing him to eight years' imprisonment.
Conclusion
The circuit court's judgment is affirmed.
Wilson, Russell and Powell, JJ., concur;
Breckenridge, J., concurs in part and dissents in part in separate opinion filed;
Draper and Stith, JJ., concur in opinion of Breckenridge, J.

"In reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." State v. Gaw , 285 S.W.3d 318, 319-20 (Mo. banc 2009) (internal quotation marks omitted).

It was later determined that Perry's driver's license was not suspended.

"[L]egal determinations of reasonable suspicion ... are reviewed de novo. " State v. Carrawell , 481 S.W.3d 833, 837 (Mo. banc 2016) (internal quotation marks omitted).

Nothing in the record suggests the officer made physical contact with Perry during their encounter.

"[Mendenhall ] says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a necessary , but not a sufficient , condition for seizure-or, more precisely, for seizure effected through a 'show of authority.' " California v. Hodari D. , 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).