Anthony Rex Gabbert, Judge *341 INTRODUCTION
Douglas Callaghan appeals a judgment entered upon a jury verdict finding him guilty of one count of second degree robbery and one count of armed criminal action. He asserts two points on appeal. He first argues that the circuit court erred in overruling his motion to suppress evidence of his brother's out-of-court identification of Mr. Callaghan. For his second point, he argues that the trial court abused its discretion in allowing his brother to testify at trial. We affirm.
BACKGROUND
The facts, in the light most favorable to the verdict, are as follows. On April 23, 2016, Douglas Callaghan walked into an Independence, Missouri Wal-Mart. He began filling a shopping cart with clothes when he was noticed by David Akers, a Wal-Mart security employee who was monitoring the store's array of security cameras. Akers used the cameras to follow Callaghan through the store. When Akers noticed Callaghan removing items from their hangers and concealing them under the clothes he was wearing, Akers radioed two store managers, Chris Decker and Kevin Hall, and asked them for assistance. After Callaghan walked to the store's garden center, Aker, Decker, and Hall headed outside and waited for Callaghan to exit the store through the garden center doors.
Callaghan exited the store. The three Wal-Mart employees approached him, and Akers announced that he was store security. Callaghan attempted to walk around them, and Akers asked Callaghan to stop. As Akers tried to stop Callaghan, Callaghan began swinging at Akers with his right hand and struck him in his cheek. After dropping some of the concealed clothes and swinging his arm at the other managers, Callaghan then struck Akers in the ribs, and this time Akers felt the poke of what he assumed was a knife. Akers told the other managers to let Callaghan go, and Callaghan fled to a parked vehicle. Akers had been scratched on his stomach, and he was bleeding from the poke on his cheek. Kevin Hall received a scratch on his finger.
The Independence Police Department began investigating the crime, and Akers provided officers with the store's camera footage including a photo still he created using the footage. The police disseminated an "Attempt to Identify" bulletin using the photo. A state employee familiar with Callaghan received the bulletin, and he recognized the individual in the photo as Douglas Callaghan. He informed his supervisor who then passed the information to the police. Upon learning of Callaghan from the state employee, the detective assigned to the case searched for Callaghan's driver's license photo. She then used the driver's license photo to generate a photo lineup for witnesses to review. After reviewing the lineup, Akers identified Callaghan's photo.
During the investigation, the police were also contacted by Greg Callaghan, Douglas Callaghan's brother. Greg became aware of his brother's possible involvement in the incident after a conversation with his mother. She told Greg that she suspected that Callaghan had been involved with the Wal-Mart robbery after she saw a TV news story about the crime which included surveillance footage from the store. She also stated, according to Greg, that Callaghan had dyed his hair black and cut it short, and that Callaghan had been asked to move out by the woman he was living with at the time. Greg contacted a friend at church who worked for the police and told him that he suspected that his brother was the robber. With Greg's permission, *342 his name was passed on to the detective investigating the case.
Greg was first contacted by the detective. She did not share any information with Greg about the investigation, but she asked him to tell her what he knew. Greg was next called by the prosecutor's office weeks later after Callaghan was arrested and charged. The prosecutor asked Greg to come in and view the surveillance footage. He viewed the footage with Callaghan's trial counsel present before being deposed. When viewing the footage, Greg positively identified his brother as the robber multiple times.
Callaghan was charged with robbery in the first degree and armed criminal action. At the motion to suppress hearing, Greg testified that he became aware of Callaghan's involvement in the crime after the conversation with their mother, that he then contacted his friend who worked for the police based on that conversation, and that he was certain that Callaghan was the man in the surveillance footage. He also positively identified his brother for the court.
Callaghan was tried before a jury where much of the foregoing evidence was adduced. The witnesses at trial included Akers, Hall, the state employee, the police detective, and Greg Callaghan. Akers and the state employee testified as to their identifying Callaghan from the photo lineup and the bulletin, respectively. The detective testified regarding her investigation including her initial phone conversation with Greg Callaghan. When Greg Callaghan testified, he again identified his brother in the surveillance footage. His trial testimony did not include any mention of the conversation with his mother discussed earlier in the motion to suppress hearing. The jury convicted Callaghan on both counts charged, and the court sentenced Callaghan after denying his motion for acquittal. He then commenced this appeal.
DISCUSSION
For Callaghan's first point, he argues that the trial court clearly erred in not suppressing evidence of Greg Callaghan's identification. Callaghan claims that the identification procedure was impermissibly suggestive in that the State contacted Greg and asked him if he could identify his brother in the surveillance footage. By affirmatively asking Greg if the man in the footage was Douglas Callaghan, he argues, the State impermissibly suggested that the man was, in fact, Douglas Callaghan. He argues that this suggestiveness rendered the identification unreliable such that it should have been suppressed. Callaghan's first point fails.
"A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." State v. McNeely , 358 S.W.3d 65, 68 (Mo. banc 2012). "In reviewing a trial court's ruling on a motion to suppress, there must be substantial evidence to support the ruling." State v. Perry , 548 S.W.3d 292, 297 (Mo. banc 2018) (citation omitted). "At a hearing on a motion to suppress, the state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." State v. Carrawell , 481 S.W.3d 833, 837 (Mo. banc 2016) (citation omitted). When reviewing the overruling of a motion to suppress, we consider "the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." Perry , 548 S.W.3d at 297 (citation omitted). We defer to the trial court's credibility determinations and factual findings. Id.
*343 "Identification testimony is admissible unless the pretrial identification procedure is impermissibly suggestive, and this suggestive procedure made the identification unreliable." State v. Russell , 462 S.W.3d 878, 883 (Mo. App. 2015) (citation omitted). "A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." State v. Floyd , 347 S.W.3d 115, 125 (Mo. App. 2011) (citation omitted). "If the procedure is suggestive, we then consider how it impacted the identification's reliability." Cothran v. State , 436 S.W.3d 247, 251 (Mo. App. 2014) (citing State v. Hornbuckle , 769 S.W.2d 89, 93 (Mo. banc 1989) ). "However, unless we find the identification procedure to have been impermissibly suggestive, we need not examine the identification's reliability." Id. (citing State v. Vinson , 800 S.W.2d 444, 446 (Mo. banc 1990) ).
In arguing that the identification procedure was impermissibly suggestive, Callaghan misstates the facts. His argument is premised entirely on the proposition that the State contacted Greg Callaghan and asked him to identify his brother in the surveillance footage. In so arguing, he implies that this contact was initiated by the State and the State alone. However, according to the facts it was Greg Callaghan who first contacted the State when he had reason to believe that his brother had robbed the Wal-Mart. The detective on the case then reached out to Greg, and she did so, according to her testimony, carefully. She testified that when she first called Greg, she did not give him any information about the case. Rather, she allowed him to share his information with her. When the prosecutor later called Greg and asked him to come in to view the footage, it had already been established through Greg's independent actions that Greg believed his brother was the robber. The State did not suggest this to Greg; Greg suggested it to the State. Therefore, the State's actions were not impermissibly suggestive. Having determined that the identification was not impermissibly suggestive, our analysis ends here. Point one is denied.
On his second point on appeal, Callaghan argues that the trial court abused its discretion in allowing Greg Callaghan to testify that his brother was the individual depicted in the surveillance footage. He argues that allowing Greg to testify as a lay expert invaded the province of the jury. He contends that the jurors were able, under the circumstances, to determine on their own if Douglas Callaghan was depicted in the footage, and that Greg's testimony allowed them to substitute his judgment for their own. This was improper in this instance, Callaghan argues, because Greg was in no better position than the jurors to identify Callaghan because he had not been "face to face" with his brother in well over a decade and the video footage was relatively clear. Furthermore, he argues, the testimony was highly prejudicial because it went to an ultimate issue of the case, namely, Callaghan's identity.
"Generally, we review the trial court's admission of identification testimony for an abuse of discretion." State v. Russell , 462 S.W.3d 878, 882 (Mo. App. 2015). "This Court will not hamper the exercise of that discretion unless it is clear that the trial court's ruling is against the logic of the circumstances and is 'so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.' " State v. Floyd , 347 S.W.3d 115, 122 (Mo. App. 2011) (citation omitted).
*344 "A trial court has wide discretion in admitting the testimony of a lay witness into evidence." State v. Presberry , 128 S.W.3d 80, 86 (Mo. App. 2003). "An ordinary lay witness generally may not testify regarding the witness's opinion on a matter in dispute because ... the jury and lay witness are [usually] in equal positions to form an accurate opinion." State v. Starkey , 380 S.W.3d 636, 647 (Mo. App. 2012) (citation omitted). However, "in the identification context, a lay witness's opinion testimony is admissible if there is a basis for concluding that the witness is more likely to correctly identify the defendant than is the jury." Presberry , 128 S.W.3d at 86 (quoting State v. Winston , 959 S.W.2d 874, 877 (Mo. App. 1997) ). Courts have held that lay witnesses were in a better position to identify the defendant than the jury if the surveillance footage was of low quality or the defendant's appearance had notably changed since the commission of the crime. See State v. Gardner , 955 S.W.2d 819 (Mo. App. 1997) (holding that a police officer's testimony identifying the defendant was admissible when he had known the defendant for ten years and the surveillance footage was low quality); State v. Winston , 959 S.W.2d 874 (Mo. App. 1997) (holding that the defendant's girlfriend's sister was qualified to identify the defendant where the record indicated that the suspect was difficult to see in the security camera printout); State v. Saucy , 164 S.W.3d 523 (Mo. App. 2005) (holding that the testimony of a witness who had lived with the defendant was admissible where the defendant's appearance had changed since the commission of the crime).
Here, we note that the record does suggest that Callaghan's appearance had changed at some point after the crime. Greg testified at the motion hearing that Callaghan cut his hair and dyed it black after the crime. At trial, the police detective testified that when Callaghan was arrested he had black hair that was shorter than it was at trial. At the same time, although Callaghan did argue that the footage was clear, he did not make any arguments or include any evidence on this appeal to suggest that his appearance was substantially similar at trial as it was when the robbery occurred. Accordingly, we are not inclined to draw any inferences on this point in his favor. In addition, his argument that Greg was not sufficiently familiar with his appearance to be able to make the identification relies on more misstatements of the facts. Greg testified that although they did not interact, he saw Callaghan exit their mother's residence and walk past his car within a month of the crime.
However, were we to assume, arguendo , that Greg's testimony was improperly admitted, Callaghan's claim would still fail. "Mere error is insufficient to support a reversal; this court will affirm the trial court's judgment unless the appellant shows that the error was so prejudicial as to deprive him of a fair trial." State v. Martin , 211 S.W.3d 648, 653 (Mo. App. 2007). "The test for prejudice where a criminal appellant claims improper admission of evidence 'is whether the improper admission was outcome-determinative.' " Id. "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." State v. Johnson , 207 S.W.3d 24, 42 (Mo. banc 2006).
At trial, Akers testified that he identified Callaghan's photo in the lineup, and the state employee who identified Callaghan *345 from the bulletin also testified as to his identification of Callaghan. The detective also testified at length about her investigation including how she generated the lineup and that Callaghan was, indeed, the same man she arrested for the crime even though his appearance had changed since his arrest. In light of this, when we consider the totality of the evidence, the testimony of Greg Callaghan was not sufficiently prejudicial to warrant reversal. Point two is denied.
CONCLUSION
Therefore, the trial court did not err in overruling Callaghan's motion to suppress, and it did not abuse its discretion in admitting Greg Callaghan's testimony regarding the same. The judgment is affirmed.
All concur.