

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

   **Respondent,**

v.

**DEREK L. JOHNSON,**

   **Appellant.**

**WD82131**

**OPINION FILED:**

**FEBRUARY 4, 2020**

---

**Appeal from the Circuit Court of Boone County, Missouri
The Honorable Jodie C. Asel, Judge**

**Before Division Three: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge,
Anthony Rex Gabbert, Judge**

## INTRODUCTION

Derek Johnson appeals his conviction for possession of a controlled substance. Across five points on appeal, he argues that the circuit court erred in overruling his motion to suppress and admitting various pieces of evidence at trial. We reverse and remand.

## BACKGROUND

In the early morning hours of September 19, 2015, Appellant Derek Johnson and a companion were walking along I-70 Drive Southwest in Columbia, Missouri in a predominately business area. Boone County Sheriff's Deputy Patrick Richardson was patrolling in the same

area. A number of burglaries, break-ins, and vehicle thefts had recently occurred in that area, though on the night in question, Deputy Richardson had not noticed any criminal activity.

Deputy Richardson noticed Johnson and his companion walking with backpacks on. Believing that it was suspicious to see two college age men walking in that particular area of Columbia at 2 A.M., Deputy Richardson observed them for a short period of time before he decided to stop them. In the time he observed them, he did not see any weapons; they did not appear to engage in a drug transaction; they did not trespass on private property or peer into windows; they walked on the side of the road, not in the middle; and he received no dispatch instructing him to look for individuals matching their description. Nonetheless, he pulled his cruiser into the entrance of a car dealership, behind the men as they walked along.

After stopping his cruiser, Deputy Richardson activated his emergency lights. When he activated his lights, the men, who were walking away from him, stopped and turned around to face him. Deputy Richardson exited his vehicle and asked the two if they would speak with him. They walked back towards Deputy Richardson. Deputy Richardson next asked Johnson and his companion to remove their backpacks for his safety and they complied. He asked them where they were headed, and they told him they were headed to a nearby hotel to meet some friends. Deputy Richardson later testified that the hotel in question was a particularly high crime area. Two additional patrol cars with three additional uniformed deputies arrived at the scene. The additional officers spread out around Johnson and his companion to prevent them from fleeing.

Deputy Richardson asked them for their identification and they complied. Neither person had any warrants for their arrest. He asked them if they had any firearms and they indicated that they did not.

2

After asking their consent, he searched their persons and found nothing. Neither individual showed any signs of inebriation or impairment nor was there an odor of alcohol or drugs. Deputy Richardson noticed that Johnson kept looking at his backpack, and he asked the men if they had anything illegal in their backpacks. They answered "no," but Deputy Richardson noticed that when Johnson said "no," he looked down, and according to Richardson, Johnson's posture indicated to him that Johnson was not confident in his answer. Richardson asked the question a second time. Johnson again answered "no" in a manner Richardson interpreted as deceptive. Deputy Richardson then asked Johnson if he minded if Richardson looked inside the backpack. Johnson responded, "go ahead."

Deputy Richardson began to search the backpack, and inside the front zipper portion of the backpack, he found a glass pipe he knew from experience was used to smoke methamphetamine. Deputy Richardson placed Johnson under arrest and read him his *Miranda* rights before continuing to search the backpack. He found a substance he suspected was methamphetamine and a scale. He asked Johnson what the scale was used for, and Johnson answered that he used the scale when he purchased drugs to ensure that he was buying the correct amount.

Deputy Richardson then brought Johnson to his patrol car, and he asked Johnson if he had anything else illegal on his person. Richardson explained to Johnson that if he did not disclose other illegal items in his possession and brought those into the jail, he would face additional, unnecessary charges. Johnson told Deputy Richardson that there was a bag of methamphetamine under his hat, which Deputy Richardson retrieved. The two bags recovered from Johnson were later sent to a crime lab. Only one of the bags was tested. Testing revealed that the bag contained 1.74 grams of methamphetamine.

Johnson was charged with possession of a controlled substance. He filed a motion to suppress the evidence found on his person and in his backpack and statements he made to Deputy Richardson at the time of his arrest. An evidentiary hearing was held, where much of the foregoing evidence was adduced. Johnson's motion was overruled, and, after a change of judge, a bench trial was held. Johnson's motion was renewed, and the evidence at issue was admitted at trial over his objection. After sentencing, he timely commenced this appeal.

## DISCUSSION

"A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." *State v. McNeely*, 358 S.W.3d 65, 68 (Mo. banc 2012). "In reviewing a trial court's ruling on a motion to suppress, there must be substantial evidence to support the ruling." *State v. Perry*, 548 S.W.3d 292, 297 (Mo. banc 2018) (citation omitted). "At a hearing on a motion to suppress, the state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled. *State v. Carrawell*, 481 S.W.3d 833, 837 (Mo. banc 2016) (citation omitted). When reviewing the overruling of a motion to suppress, we consider "the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *Perry*, 548 S.W.3d at 297 (citation omitted). We defer to the trial court's credibility determinations and factual findings. *Id.* "[T]he question of whether the Fourth Amendment has been violated is a question of law and is therefore reviewed *de novo*." *State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App. 2005) (citation omitted).

Johnson presents five points on appeal, all of which claim the court erred in overruling his motion to suppress and in admitting evidence over his objection. The first four points claim the court erred in admitting the evidence seized from Johnson's backpack and his person, and his

4

statements regarding the same. The arguments presented in Points I and II largely overlap, and Points III and IV, which also overlap, are presented as alternatives to Points I and II. Point V claims that when Johnson consented to the search of his bag, the consent was not freely given so as to justify the subsequent search. Because the points on appeal are so interrelated and they examine the encounter between Johnson and Deputy Richardson chronologically, we will consider the points together, analyzing the subject encounter and search from the beginning.[1]

Johnson first argues that the drugs found on his person and in his backpack, and his statements regarding the same, were the subject of an illegal search and seizure in violation of his constitutional rights. He argues the stop was a detention as Richardson made a show of authority such that a reasonable person would not feel that they were free to leave. Furthermore, he argues that Deputy Richardson did not possess a reasonable suspicion which would render the seizure legal at the time he stopped Johnson and his companion. Johnson then argues that even if the initial stop was viewed as consensual, Johnson was detained by the time his backpack was searched because additional deputies had arrived on the scene, and that Deputy Richardson still did not possess reasonable suspicion at that point in the exchange to justify the detention.

"The Fourth Amendment of the U.S. Constitution… guarantees citizens the right to be free from unreasonable searches and seizures." *State v. Burnett*, 230 S.W.3d 15, 18 (Mo. App. 2007) (citing *Cromer*, 186 S.W.3d at 343). The same analysis applies to Article I, Section 15 of Missouri's Constitution, as it provides the same level of protection as the U.S. Constitution. *State v. Grayson*, 336 S.W.3d 138, 143 n. 2 (Mo. banc 2011).

---

[1] We only intend to explain the structure of our analysis. This should in no way be construed as a criticism of how Johnson's brief was structured and presented, as it comported with our briefing standards and was well written.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A "seizure" occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Perry*, 548 S.W.3d at 298 (Mo. banc 2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)). "[T]he test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Perry*, 548 S.W.3d at 298 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). "If a reasonable person would feel free to disregard the police and go about their business, the encounter is consensual and the Fourth Amendment is not triggered." *Id.* (citation omitted).

In arguing that the encounter was a seizure from the outset, Johnson claims that Deputy Richardson made a "show of authority" by activating his emergency lights when he pulled his cruiser over before asking Johnson if he could speak with him. If Johnson were driving a vehicle, our inquiry would be simple, as in that context emergency lights are a well-accepted "show of authority" commanding drivers to stop their vehicles and submit to an investigative detention. *See United States v. Salazar*, 609 F.3d 1059, 1066 (10th Cir. 2010) (applying *Hodari*, cited *supra*); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (stating that the activation of emergency lights by police following another vehicle "unquestionably qualified as a show of authority"). Lights are also, among other factors, a show of authority when police approach a parked vehicle. *See United States v. Gaines*, 918 F.3d 793, 797 (10th Cir. 2019) (stating that "flashing roof lights, two marked police cars, and two uniformed officers" would cause a reasonable person to question their freedom to leave). Additionally, passengers in

vehicles pulled over by police are also deemed seized for Fourth Amendment purposes. *See*

*Brendlin v. California*, 551 U.S. 249, 263 (2007). But here, Johnson was a pedestrian.

Regarding pedestrians, Missouri courts have cited the *absence* of emergency lights when

finding that there was *not* a show of authority from police. *See State v. Perry*, 548 S.W.3d 292,

299 (Mo. banc 2018); *State v. Carr*, 441 S.W.3d 166, 170 (Mo. App. 2014). In specifically

discussing the absence of lights, the holdings in *Perry* and *Carr* strongly suggest that the

presence of emergency lights in pedestrian encounters would be a show of authority effectuating

a seizure.

We do find such holdings in other states. In *Tanner v. State*, 228 S.W.3d 852, 856 (Tex.

App. 2007), a Texas court held that there was "no question" that an officer who flashed his lights

behind two pedestrians had initiated an "investigative detention" requiring reasonable suspicion.

In *Davis v. United States*, 781 A.2d 729, 740 (D.C. 2001), a court found that flashing lights did

not by themselves constitute the seizure of a pedestrian, noting that absent additional actions by

the officer, the pedestrian would not know that he was, in fact, the target of the officer's inquiry.

However, lights coupled with a verbal request by the officer to speak with him did constitute a

seizure, as there the pedestrian knew the lights were directed at him. *Id.*[2] Under such

circumstances, the *Davis* court concluded, the pedestrian would reasonably conclude that he was

not free to leave. *Id.*

---

[2] Such an approach is not unlike other Fourth Amendment cases where courts have held that where an officer communicates a "particularized interest in an individual" such that the individual believes they are the specific target of an investigation, that "particularized interest," though not dispositive, is a factor to consider in determining if an encounter is consensual or a seizure. *United States v. Glass*, 128 F.3d 1398, 1406-07 (10th Cir. 1997).

7

To the extent Johnson is arguing that we should hold that emergency lights constitute a *per se* show of authority anytime they are used during pedestrian encounters, we decline to so hold, as such a holding is unnecessary under these facts. As in *Davis*, we find that it is a factor which weighs heavily towards finding that a seizure has occurred when accompanied by other factors indicating that an officer held a particularized interest in specific individuals.

In the present case, Johnson and his companion were walking alone, along an otherwise empty road. Deputy Richardson chose to pull his cruiser up behind the men before activating his lights, in a similar fashion to how a traffic stop of a vehicle would be initiated. The emergency lights immediately caused the men to stop walking and turn around. As there was clearly no one else present, they understandably assumed that Deputy Richardson's attention was directed towards them.[3] Once Deputy Richardson exited his vehicle and asked the men to approach, it was clear that he held a particularized interested in Johnson and his companion. We find that a reasonable person in Johnson's situation would perceive that they were not free to disregard an officer's requests and were thus not free to leave. Therefore, we hold that the men were detained when initially stopped by Deputy Richardson.[4]

---

[3] Although Deputy Richardson testified that he activated his lights for safety purposes – to be visible to passing motorists and other officers should they need to respond – the U.S. Supreme Court has indicated that unless an officer's subjective intent is communicated to the person stopped, it is irrelevant in determining whether that person has been seized. *United States v. Mendenhall*, 446 U.S. 544, 554 n. 6 (1980). Additionally, we would not expect Johnson to view Richardson's lights as merely a safety measure when they were on an empty road at a late hour, and Deputy Richardson had pulled his cruiser off of the roadway into the entrance of a closed car dealership. Safety concerns regarding passing traffic, though never absent, were certainly minimized in the present case.

[4] The parties fail to discuss the extent to which Johnson submitted to Deputy Richardson, but it is an essential element of a seizure. "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission." *Brendlin v. California*, 551 U.S. 249, 254 (2007). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 262. Here, Johnson was walking down the road with his companion when Deputy Richardson made the show of authority. Johnson then stopped, turned around, and at the officer's direction walked back to Deputy Richardson, thereby submitting to Deputy Richardson's show of authority.

Under *Terry v. Ohio*, law enforcement may make an investigatory stop if an officer can point to "'specific and articulable facts' that, taken together with rational inferences from those facts and the officer's own knowledge and experience, support a 'reasonable suspicion' that illegal activity has occurred or is occurring." *State v. Smith*, 448 S.W.3d 835, 840 (Mo. App. 2014) (quoting *Terry*, 392 U.S. at 21). "[T]he fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, "an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.*

Here, the factors listed by Deputy Richardson – the time of day, the location in a high-crime area, the lack of open businesses in that area at that time – are all "context-based factors that would have pertained to anyone" in that area at that time, and thus "should not be given undue weight." *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (concluding that a stop of three men loitering in an unlit car, in an empty parking lot, at 4:30 AM in a high-crime area was not justified due to the lack of factors specific to those men). The one factor mentioned by Deputy Richardson that is ostensibly specific to these two men – that they were wearing backpacks – does not rise to the level necessary to justify the stop. Backpacks are a common sight in most places, especially college towns, and Deputy Richardson's observation that they could be used to carry burglary tools could conceivably pertain to any number of bags or clothing items. Although conduct justifying a stop may be "ambiguous and susceptible of an innocent explanation," *Wardlow*, 528 U.S. at 125, a reasonable suspicion requires more than rank speculation about what could be contained in a coat pocket, briefcase, or backpack. We note that, in multiple cases, the federal courts of appeals have held that mere presence in a high-crime

area, late at night, and even carrying a backpack, is not alone sufficient to establish a reasonable suspicion of criminal activity, and thus justify a *Terry* stop.[5] The stop was, at the outset, not justified by a reasonable suspicion.

Even if we were to view the initial stop as consensual, by the time Deputy Richardson asked if he could search the backpack the encounter was without question a detention. The men had been patted down, their backpacks had been set to the side, and other deputies had arrived and positioned themselves to prevent Johnson and his companion from running away. At this point, Deputy Richardson had learned that the men were headed to a nearby hotel to visit friends.[6] Although the hotel was known for criminal activity, Deputy Richardson still did not possess specific and articulable facts that supported a reasonable suspicion that these individuals were engaged in criminal activity. Their destination, which was known to be a high crime area, was yet another context-based factor which would apply to anyone headed to that hotel. We have found that connection to a "drug house" supported a reasonable suspicion. *See State v. Johnson*, 427 S.W.3d 867, 874 (Mo. App. 2014) (holding a *Terry* stop was justified when the

---

[5] *See*, *e.g.*, *United States v. Hernandez*, 847 F.3d 1257 (10th Cir. 2017) (finding no reasonable suspicion where defendant "was walking next to a construction site which had been the previous target of construction material thefts," in a high-crime area, and both he and his companion were wearing backpacks); *United States v. Slocumb*, 804 F.3d 677, 682-83 (4th Cir. 2015) (finding no reasonable suspicion despite defendant's presence in high-crime area late at night, "in the parking lot of a commercial business that had been closed for several hours," and despite defendant's mumbled responses, lack of eye contact, and inconsistent responses to officer's questions); *Family Serv. Ass'n ex rel. Coil v. Wells Tp.*, 783 F.3d 600 (6th Cir. 2015) (finding no reasonable suspicion despite individuals' "late-night presence in a high-crime area," and "the absence of a nearby car or any open store or business that might explain the men's presence").

[6] In addition to visiting the hotel, Deputy Richardson testified that Johnson continued to glance at his backpack after it was removed, he avoided eye contact, and seemed less than confident in his answer when asked if the backpack contained anything illegal, conduct Richardson viewed as deceptive. Nervousness or acts of evasion can support a reasonable suspicion, but they must be more extreme than the conduct identified by Richardson. *See United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015) (finding that a failure to make eye contact, giving "low, mumbled responses" to an officer's questions, and appearing to hurry the exchange along did not support a reasonable suspicion). As the Fourth Circuit later observed, "[o]nly those among us with ice water in our veins would fail to exhibit mild signs of nervousness when confronted by a police officer…" *United States v. Bryant*, 654 F. App'x. 622, 628 (2016).

10

appellant had been seen congregating in front of a known drug house); *State v. Smith*, 373 S.W.3d 502, 506 (Mo. App. 2012) (holding that the fact that the appellant had just left a drug house supported a finding of reasonable suspicion). The incriminating explanations for visiting a drug house far outnumber the innocent ones. There are plenty of innocent reasons, however, why people visit hotels, even those located in high crime areas.

Because the initial detention of Johnson was unlawful, all of the evidence subsequently obtained as a result of that unlawful detention is fruit of the poisonous tree and must be suppressed. *See State v. Grayson*, 336 S.W.3d 138, 146-47 (Mo. banc 2011). Nonetheless, "errors in admitting evidence require reversal only when prejudicial to the point that they are outcome-determinative." *State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006). As the State's case rests entirely on evidence obtained from the illegal detention, admitting the same was clearly outcome-determinative. The judgment of the trial court is therefore reversed.

## CONCLUSION

Therefore, the trial court clearly erred in overruling Johnson's motion to suppress and in admitting evidence over Johnson's objection. The judgment of the trial court is reversed, Johnson's conviction and sentence is vacated, and the cause is remanded for further proceedings with the opportunity for retrial.

Anthony Rex Gabbert, Judge

All concur.

11