

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI,

               Respondent,

v.

NATHANIEL WADE OSBORN,

               Appellant.

WD80959

OPINION FILED:

APRIL 16, 2019

---

**Appeal from the Circuit Court of Boone County, Missouri**
**The Honorable Jeff Harris, Judge**

**Before Division Three: Gary D. Witt, Presiding Judge, Cynthia L. Martin, Judge,**
**Anthony Rex Gabbert, Judge**

### INTRODUCTION

Nathaniel Osborn appeals a judgment entered upon a jury verdict finding him guilty of two counts of assault in the second degree pursuant to Section 565.060.[1] He asserts one point on appeal. He contends that the circuit court erred in overruling his motion to suppress any evidence and testimony related to a warrantless blood draw and in admitting evidence of the same over his objection at trial. We reverse and remand for a new trial.

---

[1] All statutory references are to the Revised Statutes of Missouri as supplemented through the date of Osborn's offense in 2015, unless otherwise noted.

## BACKGROUND

The facts, in the light most favorable to the verdict, are as follows.[2] On the evening of February 19, 2015, a mother and daughter were waiting at a red light on a highway exit ramp. The light turned green, and the mother proceeded to turn left when a car driven by Nathanael Osborn ran a red light at the intersection and struck her car. Both cars were spun around in the collision. Trey Olson, whose car was immediately behind the victims' cars, witnessed the accident. After the collision, Olson exited his vehicle and approached the two cars and, as he approached Osborn's car, he could smell the odor of beer coming from the car.

Because Osborn may have been intoxicated, Officer Nathan Turner, a member of the driving while intoxicated unit, was dispatched to the accident to assist in the investigation. Officer Turner had made approximately 600 DWI arrests over his career, of which, roughly fifty to sixty involved assault charges similar to those in this case. When Officer Turner arrived at the scene of the accident, Osborn and the mother and daughter had already been transported to the hospital. Officer Turner first made contact with Osborn at the hospital approximately forty-five minutes after the accident had occurred. Osborn was initially unresponsive to both medical personnel and Officer Turner, but he began responding to Office Turner after a few minutes.

Osborn's tongue had been injured in the collision which made it impossible for him to speak intelligibly, so Officer Turner asked Osborn to respond to his questions with a "thumbs up" for "yes" and a "thumbs down" for "no." When Officer Turner asked Osborn if he had been drinking, Osborn made a hand gesture which Officer Turner interpreted to mean "just a little bit." Officer Turner then asked Osborn if he would consent to a preliminary breath test. Osborn

---

[2]    "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Rice*, 504 S.W.3d 198, 200 n.3 (Mo. App. 2016).

responded with a "thumbs up." Osborn's preliminary breath test indicated the presence of alcohol. Officer Turner testified that at this point he believed Osborn had intoxicants in his system, and he left the hospital room to contact his supervisor.

After Officer Turner left the room to consult with his supervisor, Osborn was taken from the room for medical treatment. Officer Turner again made contact with Osborn after he was returned to the room, roughly an hour after their initial interaction. Officer Turner had decided that he was going to place Osborn under arrest for driving while intoxicated, and he was going to read Osborn the implied consent law before requesting a blood sample. However, Osborn was once again unresponsive to both Officer Turner and medical personnel. Because Osborn was unresponsive, Officer Turner did not read implied consent, but he asked a nurse to obtain a blood sample. Subsequent testing of this sample by the Missouri Highway Patrol indicated that Osborn's blood alcohol content ("B.A.C.") was .161. As part of his investigation, Officer Turner later obtained a search warrant for the hospital's own emergency records which included a toxicology report indicating the alcohol level in Osborn's blood.

Osborn was charged with two counts of assault in the second degree under 565.060 RSMo.[3] Osborn moved to suppress evidence of the warrantless blood draw conducted by Officer Turner. At the evidentiary hearing, the foregoing evidence was adduced. In her argument before the trial court, the prosecutor made no mention of exigent circumstances or any other exception to the warrant requirement. Rather, the prosecutor argued that the warrantless search was justified by Missouri's implied consent laws. Osborn argued that he did not consent

---

[3] Section 565.060 was repealed effective January 1, 2017. At the time of this offense the statute, as relevant herein, provided that a person is guilty of the offense if, while in an intoxicated condition, they operate a motor vehicle and with criminal negligence cause a physical injury to another person.

3

to the search, that it was unlawful and violated his constitutional rights, and that it did not fit within any exception to the warrant requirement. After taking the motion under advisement, the trial court later overruled the motion through a docket entry. Osborn entered and then later withdrew a guilty plea at which point, per Osborn's request, the judge assigned to the case recused himself and the case was transferred to Division IV for further proceedings.

At the jury trial, Officer Turner again testified as to his investigation of the collision. Defense counsel asked the court for a continuing objection regarding evidence of the blood draw "to track through the rest of the trial." Defense counsel renewed his objection later during Officer Turner's testimony when the prosecutor moved to admit the warrantless blood draw into evidence. The trial court admitted the state's evidence "over the Defendant's objection." Officer Turner next testified that he did obtain a search warrant for the hospital's medical records pertaining to Osborn, and the prosecutor moved to admit the hospital records into evidence. In a sidebar, defense counsel conceded that the records themselves were admissible, but he objected to Officer Turner testifying as to the actual contents of those records as Officer Turner was not a medical professional qualified to interpret those records. The trial court agreed. The records were admitted, but Officer Turner did not discuss the records' contents. [4]

The prosecutor called the forensic chemist who tested the blood samples obtained by Officer Turner as part of her employment with the state's crime lab. She explained how she tested Osborn's blood sample to determine his B.A.C. and that the B.A.C. was determined to be

---

[4] In pertinent part, the hospital emergency room medical record includes the following entries: the "History of Present Illness" section notes that, "[u]pon initial examination, the patient was uncooperative, combative, and was unable to offer additional history." The "Review of Systems" section notes that, "[a] 14-point review of systems was unable to be performed as the patient was uncooperative." And, the "Psych" section notes, "Patient uncooperative, initially combative, due to intoxication."

4

.161.  The prosecutor then attempted to elicit testimony from the chemist that would explain the contents of the hospital medical records.   The hospital's toxicology report measured the ethyl alcohol on Osborn's blood in milligrams per deciliter or "mg/dL" rather than the statutory alcohol concentration levels in the blood determined by hundredths of one percent or more by weight.  *See* Sections 302.505, 302.510, and 577.012 RSMo.  Defense counsel objected to the chemist's testimony based on a lack of foundation or demonstrated qualifications.  The trial court sustained defense counsel's objection and the State made no further effort to provide testimony or other evidence to convert the hospital records from the alcohol level measured in "mg/dL" to the percentage of alcohol by weight set forth in Missouri statutes.[5]

After the close of evidence, Osborn moved for acquittal and his motion was denied.  The jury convicted Osborn of both counts of assault in the second degree.  In Osborn's motion for a new trial he once again argued that the court erred in allowing evidence of the warrantless blood draw.  The motion was denied, and this appeal was filed.

**DISCUSSION**

We first address the state's argument that this issue was not properly preserved for appeal, and as such, that we should review the trial court's actions under plain error review.  Respondent contends that when Osborn requested a continuing objection and referred back to his motion to suppress, it was not clear that the court ruled on his objection.  The state cites *State v. Neighbors,* 502 S.W.3d 745, 748 (Mo. App. 2016), for the proposition that a party must make a timely objection and obtain a ruling on the objection to preserve the matter for appeal.  While we

---

[5]     The propriety of the trial court's evidentiary ruling relating to the chemist's testimony is not before us and we thus offer no gratuitous commentary on the foundational requirements or witness competency necessary for the state to properly admit evidence converting the mg/dL ethanol measurement from Osborn's medical chart to the percentage of alcohol by weight contemplated by Missouri statutes on the issue of intoxication.

5

concede that there is some ambiguity in the portion of the transcript cited by both parties, when Osborn's attorney later renewed his objection, the court clearly stated that the evidence would be admitted "over the Defendant's objection." Osborn's point is preserved for appeal.

Osborn argues that the Fourth Amendment to the United States Constitution required law enforcement to obtain a warrant prior to drawing his blood. Warrantless blood draws are not allowed, he argues, in a search incident to an arrest, nor can Missouri's implied consent law allow for a warrantless blood draw in light of recent precedents from the United States Supreme Court. Furthermore, although exigent circumstances may sometimes justify a warrantless blood draw, the state did not present any evidence showing that exigent circumstances were present here. We agree.

"A trial court's ruling on a motion to suppress will be reversed on appeal only if it is clearly erroneous." *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007) (citation omitted). "In reviewing a trial court's ruling on a motion to suppress, there must be substantial evidence to support the ruling." *State v. Perry*, 548 S.W.3d 292, 297 (Mo. banc 2018) (citation omitted). "[T]he state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." *State v. Carrawell*, 481 S.W.3d 833, 837 (Mo. banc 2016) (citation omitted). We consider "the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *Perry*, 548 S.W.3d at 297 (citation omitted). We defer to the trial court's credibility determinations and factual findings. *Id.* "When 'there is little or no dispute about the facts, the question of whether the Fourth Amendment has been violated is a question of law and is therefore reviewed *de novo*." *State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App. 2005) (citation omitted).

6

"The Fourth Amendment of the U.S. Constitution… guarantees citizens the right to be free from unreasonable searches and seizures." *State v. Burnett*, 230 S.W.3d 15, 18 (Mo. App. 2007) (citing *Cromer*, 186 S.W.3d at 343). Save a few "specifically established and well-delineated exceptions," the United States Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment." *State v. McNeely*, 358 S.W.3d 65, 68-69 (Mo. banc 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)), aff'd by *Missouri v. McNeely*, 569 U.S. 141 (2013) (hereinafter "*McNeely*"), discussed *infra*.[6]

In *Schmerber v. California*, the United States Supreme Court held that a blood draw is a search under the Fourth Amendment requiring a warrant. 384 U.S. 757, 769-70 (1966). However, the warrantless search in *Schmerber* was deemed lawful. *Id.* at 771. Because *Schmerber* held that "special facts" justified the warrantless search, "it has since been read as an application of the exigent circumstances exception to the warrant requirement." *State v. McNeely*, 358 S.W.3d at 70 (citation omitted); *see also Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016) (discussed *infra* and holding that while breath tests may be administered without a warrant as a search incident to an arrest, warrantless blood draws may *not* be justified as a search incident to an arrest). In Missouri, our Supreme Court applied *Schmerber* to hold that although "special facts" may justify a warrantless blood draw, something beyond the natural dissipation of alcohol in a suspect's bloodstream is necessary to constitute exigent circumstances. *State v. McNeely*, 358 S.W.3d at 74-75.

---

[6] Because this opinion discusses both *State v. McNeely* and the U.S. Supreme Court's affirmance of the same in *Missouri v. McNeely*, the short-form citation of "*McNeely*" will be reserved for the U.S. Supreme Court case. Though we will generally cite the United States Supreme Court's *McNeely* case on matters of federal law, we will rely on *State v. McNeely* as authority on matters of state law.

7

The United States Supreme Court affirmed our Supreme Court's approach in *Missouri v. McNeely* when it considered "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency" sufficient for blood draws to be exempt from the warrant requirement in DWI cases. 569 U.S. at 147. The United States Supreme Court recognized that the "imminent destruction of evidence" is an exigent circumstance which may justify a warrantless search. *Id.* at 149-50. And the Court acknowledged that because a person's B.A.C. drops steadily with the passage of time, evidence of intoxication in DWI cases is being destroyed, minute by minute, by the body's metabolic processes. *Id.* However, the Court declined to declare this metabolic fact a *per se* exigency justifying warrantless blood draws in DWI cases. *Id.* at 156. The Court noted that modern telecommunications and subsequent changes in the law make it considerably easier for officers to seek warrants in short periods of time. *Id.* In addition, because blood draws involve agents of the state "piercing" a suspect's skin, intimate privacy interests are implicated, militating against a *per se* exigency. *Id.* at 159. Accordingly, the Court held officers should seek warrants before conducting blood draws whenever possible, or present facts establishing that exigent circumstances, ***beyond the destruction of evidence***, excused them from the requirement to do so. *Id.* at 160.

In the present case, during the suppression hearing, the state did not argue that exigent circumstances excused Officer Turner from the requirement of seeking a warrant before conducting a blood draw, and painfully absent from Officer Turner's testimony is any mention of why he failed to even attempt to obtain a search warrant during the hour that passed before he again made contact with Osborn. Nor was there any evidence of exigency offered by the State at trial. The record is thus void of any explanation for Officer Turner's failure to attempt to secure a warrant before ordering a blood draw from Osborn. The trial court's denial of Osborn's

8

motion to suppress, and its related admission of B.A.C. evidence at trial over Osborn's objection, was clearly erroneous in light of the holdings in the *McNeely* cases.

The state argues that the *McNeely* cases do not control the admission of B.A.C. evidence from a warrantless blood draw because Missouri statutes control this issue. The state relies on Sections 577.020 and 577.033 to argue that warrantless blood draws are authorized by Missouri's implied consent laws. In other words, the state argues that because consent is always an exception to a warrantless search, Missouri's implied consent laws afford the consent required to authorize a warrantless blood draw. This is the same - and only - argument the state made during the hearing on the motion to suppress.

Section 577.020 states that individuals operating vehicles on public roads are deemed to have consented to "a chemical test or tests of the person's breath, blood, saliva, or urine for the purpose of determining the alcohol or drug content of the person's blood" in the event they are arrested on suspicion of driving while intoxicated or they are involved in a traffic accident involving a "readily apparent serious injury" or fatality.[7] Section 577.033 states:

> Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusing to take a test as provided in sections 577.020 to 577.041 shall be deemed not to have withdrawn the consent provided by section 577.020 and the test or tests may be administered.

The plain language of these statutes deems consent to have been afforded for a warrantless blood draw from an unresponsive subject. That does not, however, insulate the statutes from constitutional scrutiny.

---

[7]     Section 577.020 presents other situations when consent is implied which we omit due to their irrelevance to this case.

It is true that Section 577.033 has been previously cited with approval to affirm a criminal conviction based in part on the admission of blood-alcohol evidence from a warrantless blood draw taken from an unresponsive subject.  *See State v. Clark,* 55 S.W.3d 598 (Mo. App. 2001) (rev'd on other grounds by *Joy v. Morrison*, 254 S.W.3d 885 (Mo. banc 2008)).  We agree with Osborn that the holding in *Clark* is suspect, in light of the *McNeely* cases and an even more recent case, *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016).

In *Birchfield*, the United States Supreme Court considered, in the context of implied-consent laws, whether motorists could be subject to criminal penalties for refusing to consent to B.A.C. tests.  The Court concluded "that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense."  136 S. Ct. at 2186.  *Birchfield* did not declare implied consent laws unconstitutional, and did not directly consider whether implied consent laws can be relied on to justify warrantless blood draws from unresponsive subjects on the theory of statutory consent.   However, we deem it probative that the Supreme Court, in reiterating its *McNeely* holding, stated that warrantless blood draws "*always* require case-by-case determinations," *Id.* at 2180 (emphasis added), suggesting strongly that *per se* reliance on implied consent statutes to overcome the lack of a warrant will not pass constitutional muster.  In doing so, the Court was careful to differentiate between reliance on implied consent laws to invoke civil versus criminal penalties:

> It is well established that a search is reasonable when the subject consents, and that sometimes consent to a search need not be express but may be fairly inferred from context.  Our prior opinions have referred approvingly to the general concept of implied-consent laws ***that impose civil penalties and evidentiary consequences*** on motorists who refuse to comply. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must

10

be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

136 S. Ct. 2160, 2185 (citations omitted) (emphasis added).

We construe *Birchfield* to require us to reject the state's argument that Missouri's implied consent laws permit warrantless blood draws from unresponsive subjects in criminal cases, in the absence of evidence establishing an exigent circumstance. Though our own Supreme Court has not directly addressed this issue, it is noteworthy that in *State v. McNeely*, 358 S.W.3d at 75 n. 9, the Court held that "[b]ecause the warrantless blood draw in this case was a violation of Defendant's Fourth Amendment right to be free from unreasonable searches, there is no need to address the State's arguments based on Missouri's implied consent law." We also note that other states have similarly concluded that warrantless blood draws from unresponsive drivers in criminal cases cannot be summarily controlled by an informed consent statute. *See, e.g., State v. Romano*, 369 N.C. 678 (2017) (citing *Birchfield* in holding that North Carolina's implied consent law cannot be used to justify the warrantless blood draw of an unresponsive motorist); *State v. Havatone*, 389 P.3d 1251 (Ariz. 2017) (holding that case-specific exigent circumstances are required for warrantless blood draws even when the "unconscious clause" of their law applies); *Bailey v. State*, 338 Ga. App. 428 (Ga. Ct. App. 2016) (holding that Georgia's implied consent law does not justify warrantless blood draws of unconscious suspects), rev'd on other grounds by *Welbon v. State*, 799 S.E.2d 793 (Ga. 2017). Accordingly, we hold that Section 577.033 does not allow warrantless blood draws of unresponsive drivers in criminal cases unless exigent circumstances are present as required by *McNeely*.[8]

---

[8] Our ruling has no bearing on cases addressing civil penalties where application of implied consent laws do not implicate the 4th Amendment. *See, e.g.*, *Nace v. Director of Revenue*, a driver's license revocation case, where

11

The state alternatively argues that if we find that the warrantless blood draw violated the Fourth Amendment, we should not impose the harsh remedy of the exclusionary rule. The state cites the good faith exception, independent source rule, and inevitable discovery doctrine as applicable exceptions to the exclusionary rule. The state further argues that the admission of the blood draw was not sufficiently prejudicial to warrant a reversal. These arguments fail.

We first address the good-faith exception to the exclusionary rule. The exclusionary rule states that "all evidence obtained by searches and seizures in violation of the Constitution … is inadmissible in state court." *State v. Grayson*, 336 S.W.3d 138, 146 (quoting *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). "The rule is calculated to prevent, not to repair. Its purpose is to deter - to compel respect for the constitutional guaranty in the only effectively available way - by removing the incentive to disregard it." *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). The good-faith exception was initially used to ensure that "evidence obtained by police officers in objectively reasonable reliance on a subsequently invalidated search warrant should not be suppressed." *State v. Clampitt*, 364 S.W.3d 605, 613 (Mo. App. 2012) (citing *United States v. Leon*, 468 U.S. 897 (1984)). As good-faith conduct is not what the exclusionary rule seeks to deter, the exception states that in certain situations, the rule need not be applied. The exception has been expanded to include other, good-faith police conduct, such as when "searches [are] conducted in objectively reasonable reliance on binding appellate precedent." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 142 (2009)). The state seeks this application, arguing that Officer Turner was relying on Sections 577.020 and 577.033, collectively implying consent to withdraw blood from an unresponsive subject.

we held that a driver who was unresponsive and unable to consent had not withdrawn consent pursuant to section 577.033. 123 S.W.3d 252 (Mo. App. 2003).

The state's argument is without merit. Beyond *Clark*, a 2001 decision, no appellate opinion has held that implied consent laws supersede the application of the 4th Amendment. Importantly, after *Clark*, the *McNeely* cases plainly held that warrantless blood draws are not subject to a *per se* exigent circumstances argument, and instead, that each warrantless blood draw must be supported by exigent circumstances determined on a case-by-case basis. In addition, in *State v. McNeely*, our Supreme Court rejected an argument which relied on implied consent laws that "police officers now may rely on the well settled principle that obtaining blood from an arrestee on probable cause without a warrant and without actual consent does not offend constitutional guarantees," noting the assertion "rests on a fundamental misreading of *Schmerber*." 358 S.W.3d at 68, n. 2. There is no basis grounded in settled appellate law to support affording Officer Turner's warrantless search protection from application of the exclusionary rule based on the good faith exception.

We finally turn to the independent source rule and the inevitable discovery doctrine. We note that when our Supreme Court addressed both approaches to avoiding application of the exclusionary rule, it stated that "the purpose of the exclusionary rule is to ensure that 'the prosecution is not to be put in a better position than it would have been if no illegality had transpired.'" *State v. Grayson,* 336 S.W.3d 138, 151 (Mo. banc 2011) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). "Conversely, the reason for the exceptions is to ensure that 'the prosecution is not put in a worse position simply because of some earlier police error or misconduct.'" *Id.* These exceptions are not applicable here. Though the state offered hospital records into evidence at trial which included a toxicology report measuring the ethanol present in Osborn's blood in milligrams per deciliter, the trial court sustained Osborn's objections to further discussion of the records by a chemist called by the state based on a lack of foundation or

13

demonstrated qualifications. As such, the state presented no evidence equating the toxicology information in the medical records with its own B.A.C. report, including converting the calculations within the exhibit into the levels required by the statutes. The state's failure to alternatively demonstrate that Osborn's B.A.C. exceeded the legal limit, despite its awareness that admission of the B.A.C. report was contested, is a matter of trial strategy, and not a scenario that warrants application of the independent source rule or the inevitable discovery doctrine.

We are thus left with the prejudicial nature of the evidence erroneously admitted. "Errors in admitting evidence require reversal only when prejudicial to the point that they are outcome-determinative." *State v. Johnson*, 207 S.W.3d 24, 42 (Mo. Banc 2006). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Id.*

Here, though there was evidence of Osborn's severely erratic driving, an on-the-scene witness who smelled the odor of beer coming from Osborn's vehicle as he approached Osborn's vehicle, Osborn's admission to drinking alcohol, and medical chart entries that reflect that Osborn was uncooperative and combative due to intoxication, there was no properly admitted evidence that was duplicative of the extremely prejudicial warrantless blood draw evidence. Hence, we conclude that the poisonous presence of the improperly admitted warrantless blood draw evidence was prejudicial beyond repair and, thus, outcome determinative.

14

## CONCLUSION

The evidence of the warrantless blood draw was the product of an illegal search. Accordingly, the trial court erred in overruling Mr. Osborn's motion to suppress and permitting the admission of the B.A.C. results relating to that illegal search. The judgment is reversed and remanded for a new trial.

_____

Anthony Rex Gabbert, Judge

All concur.