

# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | )   **WD85545 consolidated with** |
| Respondent, | )   **WD85898** |
| | ) |
| v. | )   **OPINION FILED:** |
| | ) |
| ROBERT SHANNON BILLINGS, | )   **May 28, 2024** |
| | ) |
| Appellant. | ) |
| | ) |

**Appeal from the Circuit Court of Platte County, Missouri**
**The Honorable Thomas Fincham, Judge**

**Before Division Two: Thomas N. Chapman, Presiding Judge,**
**Karen King Mitchell, Judge, and W. Douglas Thomson, Judge**

Robert Billings appeals his convictions and sentences for two counts of first-degree statutory sodomy. He contends that the trial court abused its discretion in admitting propensity evidence from two witnesses; plainly erred in failing to dismiss the venire panel following a juror's inflammatory and prejudicial outburst; plainly erred in imposing consecutive sentences under the mistaken belief that consecutive sentences were statutorily mandated; and plainly erred in submitting the verdict director for Count I in violation to his right to a unanimous verdict. The judgment is affirmed.

## Factual and Procedural Background[1]

Billings was charged by amended information with first-degree statutory sodomy for attempting to touch Victim 1's vagina with his hand (Count I), first-degree statutory sodomy for attempting to touch Victim 2's vagina with his hand (Count II), and sexual misconduct involving a child for exposing his genitals to Victim 2's sister (Count III). The jury found Billings guilty of Counts I and II and not guilty of Count III.

The evidence at trial was as follows. Victim 1 is the great-niece of Billings. Victim 2 and Victim 2's sister are Billings's nieces and cousins of Victim 1. In May 2019, six-year-old Victim 1 told her older sister, who was 12 or 13 years old at the time, that Billings had touched her inappropriately. She said that Billings had hurt her, and when her sister asked how, she said that "he touched me down there." They were at her sister's friend's house "playing a game, telling each other secrets" when Victim 1 made the disclosure. Victim 1 was "really nervous" and was "really scared to tell an adult" but her sister told her that if they didn't tell an adult, "something bad could happen again and it's a really serious thing." The next morning, Victim 1 disclosed to a counselor at school.

Thereafter, Victim 1's mother (Billings's niece) and grandmother (Billings's

---

[1] Billings does not challenge the sufficiency of the evidence supporting his convictions. In criminal cases, the appellate court views the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020). This opinion will not set out the evidence relevant to Count III, of which Billings was acquitted.

sister) reported to law enforcement that Victim 1 had told a school counselor that Billings had inappropriately touched her. A detective with the Parkville Police Department ("Detective") set up a forensic interview with Victim 1 through the Children's Advocacy Center at Synergy Services. The forensic interview was video recorded, and it was admitted into evidence at trial and played for the jury.

In the interview, Victim 1 disclosed to the forensic interviewer that Billings tried to touch her private more than one time. She said that she was five years old when Billings first "tried to touch me in inappropriate places." She pointed to her "private" and indicated the vagina on an anatomical drawing. She said that Billings put his hand on her on top of her clothes and that his hand was not moving and was "still as a rock." She said that it happened while they were watching TV on Billings's bed. Victim 1 told Billings to stop. She also disclosed that Billings tried to get her to touch "it" and circled the penis on an anatomical diagram, which she called a "private." Victim 1 did not want to touch Billings's private, but Billings told her that he wanted her to. Billings also tried to get Victim 1 to touch his butt with her hand. She did not touch Billings. Victim 1 said that she was six years old the last time Billings tried to touch her. She also told the interviewer that Billings tried to do the same thing to her two cousins, later identified as Victim 2 and Victim 2's sister. She added that there was something she was "not ready" to talk about concerning Billings and that she wanted her mother to know that. At trial, Victim 1, who was nine years old at the time, acknowledged that Billings had done something bad to her and had hurt her. She said that he touched her. She remembered

that she had told her older sister what Billings had done.

As a result of Victim 1's forensic interview, Detective contacted Victim 2 on June 6, 2019. Victim 2, who was 15 years old at the time, told him that when she was five years old, Billings had tried something similar with her. She said that Billings unzipped her onesie pajamas and started sliding his hand down her body until one of his fingers was inside her underwear. At that point, she stood up, zipped up her onesie, and went upstairs. She also told Detective that Billings slapped her butt on Christmas 2018. Detective set up forensic interviews with Victim 2 and Victim 2's sister.

In her forensic interview, Victim 2 repeated her disclosure that when she was five years old, Billings had attempted to touch her when she was wearing onesie pajamas.[2] She "literally drew a line kind of from the top of her neck, kind of between her chest just above to probably the pubic bone as to where he tried to touch." Victim 2 "said no and left."

Victim 2, who was 18 years old at trial, testified that when she was younger, she had a close bond with Billings but over time, "it was just uncomfortable being around him." She said that when she and her sister, who was a year older than her, were younger, they would sometimes spend the night at their grandmother's house, where Billings also lived. They would sometimes sleep in Billings's bedroom. She continued that Billings "would look at naked women" on his computer "in front of us without a care

---

[2] Victim 2's forensic interview was admitted and played for the jury but was not included as an exhibit on appeal.

**4**

in the world." He said that the women "were hot." Victim 2 "just got up and left." She explained that one time when she was five or six years old, she and Billings were lying on a futon in the basement watching TV when Billings unzipped her onesie, ran his hand down her body, and put his finger in her underwear. He stopped when she got up and went upstairs. Billings told Victim 2 that "it was our secret and we need to keep it that way." She "waited a little bit" and then told her sister what had happened. She told her aunt, Victim 1's grandmother, about the incident around the time that she talked to the police. Victim 2 confronted Billings at some point by text about the incident, and he did not deny it. He "blamed it on his drinking at the time." Victim 2 also testified that while Victim 1 and Billings had once been "really close" and "best friends," she witnessed a change in Victim 1's behavior around Billings. "[S]he just didn't want to be around him any more" and "[s]he did not want to be alone with him."

In her forensic interview, Victim 2's sister disclosed that Billings "had pulled up pictures of naked women on a computer" and she and Victim 2 "were able to see those images." He said, ""[H]ey, they are hot." The girls "felt uncomfortable" and "chose to leave that room at that time."

On July 25, 2019, Detective interviewed Billings. The interview was video recorded, and it was played for the jury. Detective first had Billings read aloud the Miranda warnings, which he did, and Billings waived them. Detective then told Billings that Victim 1 had disclosed that he tried to touch her vagina, and Billings said that it was "not true." Billings explained that he lived with his mother, Victim 1's great-

**5**

grandmother and Victim 2's grandmother. Victim 1 spent the night at their house and was sleeping in Billings's bed with him when she wet the bed. He said that he "probably reached toward her crotch to see if she had wet panties." He said that he was "half asleep" and that "of course I would feel her crotch, just to see if she was wet." He then told Victim 1 to go see her great-grandmother so she could help her change her pants. Billings told Detective, "I don't remember any other time I was reaching for her crotch when she was in bed with me."

Detective then told Billings that Victim 2 had disclosed that when she was five years old and they were watching TV, he unzipped her onesie pajamas and reached his hand inside her underwear and tried to touch her vagina. Billings denied that it had happened, and said, "I know she thinks it happened because she texted me about it." He said that Victim 2 texted "You put your hand down my onesie" and that he responded, "I don't remember. If you say it happened, I won't argue with you about it." Billings said he was "drinking at the time a little bit, sure."

Billings denied viewing pornography on his computer when Victim 2 and Victim 2's sister were there and said that it may have been possible that they saw naked women on one of the newsfeeds he looks at called Reddit. He did not remember saying the naked women were "hot." Billings also denied telling Victim 2 and Victim 2's sister that if they ever lost their virginity, they should tell him all about it. He explained that he had told them that they could talk to him about anything, including sex, and said, "Obviously, I was too open." Billings told the detective that he is "one of the greatest influences" on

**6**

"those kids" and that he "made sure that they feel loved." He said that the girls' father was not a caring person and "that's something I provide for them." He said he loved "those kids so much" and "I was always sweet to those girls."

Prior to trial, the State filed a request to admit propensity evidence in the form of the testimony of two witnesses pursuant to Article I, Section 18(c) of the Missouri Constitution. The trial court heard argument on the issue and overruled Billings's objection. At trial, Billings again objected to the admission of the propensity evidence and was granted a continuing objection. The State introduced the testimony of Propensity Witness 1, who was 46 years old at the time of trial, and Propensity Witness 2, who was 44 years old. These witnesses are sisters, and their father and Billings are first cousins. When they were children, they would see Billings at family gatherings, such as holidays. They testified about an incident that occurred when Billings and his family were at their house for an Easter celebration. Propensity Witness 1 was in third grade and seven or eight years old, Propensity Witness 2 was five or six years old, and Billings was 13 or 14 years old at the time. Propensity Witness 2 found Billings in her parents' bedroom watching TV. She had been learning about magnetism at school and had some magnets. Billings suggested that they play a game with the magnets. First, Billings hid the magnets on his genitalia inside of his underwear, and Propensity Witness 2's "job was to find them, kind of like a hide and seek situation," which she did. Next, she hid the magnets on her genitalia, and Billings found them, touching her genitalia. After this "goes on for a little bit," Propensity Witness 1 came into the room looking for

7

her sister. She asked what they were doing, they said they were playing a game, and her sister asked if she wanted to play. Propensity Witness 1 was told that she was supposed to hide the magnets on her "private parts," and Billings was supposed to find them. She hid the magnets, and Billings found them, touching her "private areas." Propensity Witness 1 said we can't play this game anymore, and she and her sister left the room. Propensity Witness 1 and Propensity Witness 2 did not immediately tell an adult what had happened. They discussed the incident again years later when they were in their early 20s, and Propensity Witness 2 disclosed the incident to her mother.

Billings testified in his own defense at trial. Regarding the allegation made by Victim 1, he said that she had wet the bed, which she had never done before, and he told her that it was okay and sent her to her great-grandmother to change her clothes. Confronted with his statement to the detective that he may have patted her to see if her underwear was wet, Billings explained,

> Well, I was just trying to come up with any reason why she would say I tried to touch her down there and that's the only incident that entire weekend that I could come up with, you know, other than bathing her that I was anywhere near that area, so it was just the first thing that came to mind. I don't remember actually putting my head (sic) down there, no.

Billings admitted that Victim 2 texted him about the incident with her onesie pajamas but that he did not "remember any incident like that." He did not think it could have happened "the way she described it." He said that when Victim 2 texted him, it threw him "for a loop" and he "tried to think of anything, any reason why I would remember and that's just the first thing that popped up is that I was drinking, that I did

**8**

drink on a regular basis back in those days." He testified that Victim 2 didn't say anything to him about smacking her butt "because why would she? It was a normal thing that we did to each other. We roughhoused all the time."

Billings admitted that he had pornography on his computer "many times" but that he did not look at it with the kids in the house. He said that it is possible that he used the term "hot" to describe the women. Billings denied that he told Victim 2 and her sister that they should tell him when they lost their virginity but admitted that he told them that they could talk to him about anything, including sex and that if they had "any questions about boys, let me know, you know, I'll tell you." He claimed that he wanted them "to be prepared for the world."

Finally, Billings admitted that he and the propensity witnesses played a game involving hiding a toy in their parent's bedroom when he was 13 years old in 1983. He did not think it was magnets but did not remember for sure. He said that "at some point the toy ended up being on one of the people's, like either mine or theirs body, maybe in the pocket or something, and then it ended up in our pants." He explained, "I don't remember who did it first. I do remember that earlier in the day [Propensity Witness 2] kept asking me to come in her room and play doctor with her but I wasn't really wasn't interested in that[.]"

The jury found Billings guilty of the two counts of first-degree statutory sodomy (Counts I and II) and not guilty of sexual misconduct involving a child (Count III). The jury recommended sentences of 12 years' imprisonment for each count.

9

On July 7, 2022, the trial court conducted a sentencing hearing, orally pronounced sentences of 12 years' imprisonment on each count of first-degree statutory sodomy to be run consecutively, and recorded a docket entry. On July 11, 2022, the trial court filed a formal written judgment.

On July 19, 2022, Billings filed a notice of appeal and motion to proceed *in forma pauperis* in the trial court. On July 21, 2022, the trial court granted the *in forma pauperis* motion and filed the notice of appeal in this court.

Thereafter, this court requested that Billings file suggestions as to why the appeal should not be dismissed as untimely, citing Rule 81.04(a), which provides that the notice of appeal must be filed not later than ten days after the judgment or order appealed from becomes final, and *State v. Larson*, 79 S.W.3d 891, 893 (Mo. banc 2002), which held that a criminal case becomes "final" for purposes of appeal when a sentence is entered or imposed. Billings filed the requested suggestions. On September 2, 2022, he also filed a motion to find the notice of appeal timely filed (WD85545), which was taken with the case. In his motion, he argued that because the July 7, 2022 docket entry contemplated a later formal judgment, the signed formal written judgment on July 11, 2022, was the final judgment for purposes of appeal.

On December 16, 2022, Billings filed a motion to file notice of appeal out of time as a poor person (WD85898). On December 28, 2022, this court issued an order sustaining the motion and giving Billings 10 days from that date to file his notice of appeal. On December 29, 2022, Billings filed a notice of appeal in the trial court in

**10**

accordance with this court's order, and the cases were consolidated. Billings's motion to find the notice of appeal timely filed (WD85545) is denied as moot.

## Points One and Two

In points one and two, Billings contends that the trial court abused its discretion in admitting propensity testimony from Propensity Witness 1 and Propensity Witness 2. He argues that their testimony had little to no probative value due to passage of time, dissimilarity of acts, and lack of necessary corroboration; and that the probative value of such testimony was substantially outweighed by its unfair prejudice.

"Article I, sections 17 and 18(a) of the Missouri Constitution combine to guarantee that a defendant has 'the right to be tried only on the offense charged.'" *State v. Coyle*, 671 S.W.3d 702, 721 (Mo. App. W.D. 2023) (quoting *State v. Burns*, 978 S.W.2d 759, 760 (Mo. banc 1998)). This right prohibits the admission of evidence of prior crimes for the purpose of demonstrating the defendant's propensity to commit the crimes with which the defendant is actually charged. *Id.* Article I, Section 18(c) of the Missouri Constitution creates a narrow exception to this constitutional protection where a defendant is charged with sexual offenses committed against children. *Id.* It provides:

> Notwithstanding the provisions of sections 17 and 18(a) of this article to the contrary, in prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

MO. CONST. art. I, § 18(c). The plain language of this provision indicates that the trial court "retains substantial discretion in admitting or excluding this evidence even if there is a danger of some prejudice." *State v. Prince*, 534 S.W.3d 813, 821 (Mo. banc 2017).

"The determination of how much and what kind of probative value particular propensity evidence may have, the nature and extent of the danger of unfair prejudice presented by that evidence, and whether the former is substantially outweighed by the latter, are intensely case-specific questions." *State v. Williams*, 548 S.W.3d 275, 288 (Mo. banc 2018). "The relevant factors to be considered in deciding these questions will vary from case to case, as will the weight to be afforded any one factor in particular." *Id.*

To have probative value, propensity evidence "must be sufficient for the jury to conclude the defendant actually committed the prior criminal act." *Id.* Furthermore, "the evidence of the prior criminal act must tend to show the defendant actually had a propensity to commit the charged crime." *Id.* at 289. To make such determination, the similarity between the prior and charged conduct and the amount of time between the two are considered. *Id.*; *State v. Robinson*, 662 S.W.3d 120, 126 (Mo. App. S.D. 2023); *State v. Shepard*, 662 S.W.3d 761, 770 (Mo. App. E.D. 2023). The State's need for the propensity evidence to prove the case may also be considered when determining probative value. *Id.*

In this case, Propensity Witness 1 and Propensity Witness 2 testified similarly about an incident at Easter where they played a game with Billings where they hid a

**12**

magnet on their genitals and he found it, touching them there. Billings admitted that he played a game with Propensity Witness 1 and Propensity Witness 2 involving hiding a toy and at some point, the toy "ended up in our pants." From this evidence, the jury could reasonably conclude that the prior acts had occurred.

Furthermore, the prior conduct and the charged conduct were very similar. All of the incidents involved young girls. Victim 1 and Victim 2 were five years old, Propensity Witness 1 was seven or eight years old, and Propensity Witness 2 was five or six years old. All of the girls were relatives of Billings. And the acts were identical—Billings touching or trying to touch the young girls' vaginas with his hand. In the case of Propensity Witness 2 and Victim 1, Billings also induced or attempted to induce them to touch his genitalia. Each act took place in a family home (at Billings's and his mother's home for the crimes charged, and in his cousin's home for the conduct involving the propensity witnesses). Although the incident with Propensity Witness 1 and Propensity Witness 2 occurred approximately 26 years before the incident with Victim 2 and approximately 36 years before the incident with Victim 1, "remoteness of time does not automatically render evidence of prior criminal acts inadmissible." *Robinson*, 662 S.W.3d at 126 (citing *Prince*, 534 S.W.3d at 819). "On the contrary, 'an inference of propensity might be proper notwithstanding a significant time lapse between the prior crime and the charged crime if the two crimes are highly similar.'"[3] *Id.* (quoting

---

[3] However, "an inference of propensity might not be proper if the prior crime and the charged crime are only somewhat similar unless the two occurred over a short span of time." *Williams*,

*Williams*, 548 S.W.3d at 289). Missouri courts have found that propensity evidence was admissible under section 18(c) even when the acts occurred over 20 years before the charged acts. *Id.* (17 and 21 years between prior and charged acts); *State v. Brown*, 596 S.W.3d 193, 208-09 (Mo. App. W.D. 2020) (21-year gap); *State v. Peirano*, 540 S.W.3d 523, 528-29 (Mo. App. S.D. 2018) (gaps between 19 and 27 years); *State v. Brammer*, 614 S.W.3d 18, 27-28 (Mo. App. E.D. 2020) (past conviction over 25 years before charged acts). The key factor in those cases was a strong similarity between the prior and charged acts that outweighed any concerns about the temporal gap between the acts. *Robinson*, 662 S.W.3d at 126. The strong similarities in this case between the prior and charged conduct was probative of Billings's propensity to commit the charged crimes. *See Coyle*, 671 S.W.3d at 721-22, and *Shepard*, 662 S.W.3d at 770 (both holding that uncharged sexual misconduct was probative of defendant's propensity to commit charged offenses given similarities in the ages of the victims of the uncharged and charged crimes, defendants' familiarity with the victims, and the similarities of the alleged sexual conduct).

Finally, the State had a need to introduce evidence of Billings's prior acts. The case rested entirely on the testimony of Victim 1 and Victim 2. They were the only eyewitnesses who testified regarding Billings's actions toward them. There was no physical evidence to corroborate their testimony. Other witnesses only indirectly

---

548 S.W.3d at 289.

**14**

corroborated their testimony. The defense extensively attacked not only the victims' credibility but also the other State witnesses, including the forensic interviewer. The testimony of Propensity Witness 1 and Propensity Witness 2 need not have been "absolutely necessary" to the State's case, but only "helpful or practically necessary." *Williams*, 548 S.W.3d at 289 (internal quotes, citation, and emphasis omitted). The testimony of Propensity Witness 1 and Propensity Witness 2 had significant probative value.

Next, the probative value of the evidence must be weighed against its danger of unfair prejudice. Several factors bear on the prejudicial effect of propensity evidence including whether the jury knows or can fairly infer the defendant was punished for his past criminal act, how the State proves the prior criminal act at trial, whether the charged crime is overshadowed by evidence of the prior act, and the manner in which the State uses the evidence of a prior act at trial. *Id.* at 290-91; *Coyle*, 671 S.W.3d at 722; *Robinson*, 662 S.W.3d at 126; *Shepard*, 662 S.W.3d at 770-71.

Here, the State sought to prove the prior acts committed by Billings against Propensity Witness 1 and Propensity Witness 2 through their live testimony. Live testimony regarding prior bad acts increases the danger of unfair prejudice. *Williams*, 548 S.W.3d at 290; *Coyle*, 671 S.W.3d 723. But it is not *per se* unfairly prejudicial. *Coyle*, 671 S.W.3d at 723; *Shepard*, 662 S.W.3d at 771. The risk of unfair prejudice increases if the testimony is overly detailed, graphic, and not dispassionate. *Id.* The direct examination of Propensity Witness 1 encompassed seven pages of the transcript

**15**

during the four-day trial; Propensity Witness 2's direct examination encompassed five and half pages. The State's questions of both witnesses elicited brief, factual responses. The witnesses, who were 46 and 44 years old at the time of trial, related only the details necessary to report that Billings touched their "genitalia" and "private parts" during the hide-the-magnet game. While their demeanor cannot be discerned from the written transcript, nothing in the record indicates that either witness became emotional during their testimony. The live testimony of Propensity Witness 1 and Propensity Witness 2 did not increase the risk of unfair prejudice.

Additionally, the manner in which the State used the evidence at trial did not increase the danger of unfair prejudice by unduly emphasizing Billings's prior acts. When the State spends an undue amount of time emphasizing the prior conduct or flagrantly invites the jury to convict the defendant because he is a bad person rather than because he committed the charged crime, the danger of undue prejudice is "untenable." *Williams*, 548 S.W.3d at 291; *Shepard*, 662 S.W.3d at 771-72. To the contrary, if the State "spends relatively little time on the issue of a defendant's prior crimes and merely uses the evidence for its proper purpose (namely, to suggest the defendant has a propensity to commit the charged crime), the danger decreases and may—on balance— not be unfair." *Williams*, 548 S.W.3d at 291. The State devoted comparably little time to the incident with Propensity Witness 1 and Propensity Witness 2. In its opening statement, it only briefly mentioned them, and as noted, their testimony constituted only a small portion of the State's case. During closing argument, the State briefly mentioned

**16**

Propensity Witness 1 and Propensity Witness 2 and suggested that their stories were very similar to the stories of Victim 1 and Victim 2. It did not suggest that Billings should be convicted of the statutory sodomy of Victim 1 and Victim 2 because of his prior conduct with the propensity witnesses or because he was a bad person. The State's use of the propensity evidence was limited to its proper purpose—to suggest that Billings had a propensity to commit the charged crimes. Its limited and proper use of the propensity evidence lowered the danger of unfair prejudice, did not overshadow the charged crimes, and minimized the risk that the jury would convict Billings of the charged crimes as a means to punish him for his prior uncharged acts. *Coyle*, 671 S.W.3d at 724.

Nevertheless, Billings relies heavily on a concurring opinion by Judge Powell in *State v. Minor*, 648 S.W.3d 721, 741 (Mo. banc 2022), to argue that unadjudicated prior bad acts "rarely survive the probative-versus-prejudicial balancing test." While the concurring opinion is *dicta* because the issue of whether the prejudicial value of propensity outweighed its probative value was not preserved for appellate review, its precedential value cannot be overlooked because it was joined by a majority of the Court. *Id.* at 738, 742; *Coyle*, 671 S.W.3d at 724-5.

Judge Powell identified two risks of admitting evidence of unadjudicated prior bad acts through live testimony that do not exist with evidence of past criminal convictions and admissions of guilt. *Minor*, 648 S.W.3d at 739. He wrote:

> First, instead of the stoic and emotionless presentation of an exhibit evincing the existence of a prior conviction, we have a living, breathing person recounting unfathomable details of traumatic events and abuse.

**17**

Second, on top of the increased emotional effect of such evidence lies the fundamental problem of establishing the defendant engaged in the unadjudicated criminal act….The presentation of evidence necessary to demonstrate the defendant committed an unadjudicated act effectively creates a trial within a trial.  Unlike an exhibit of one or more prior criminal convictions that speaks for itself, allegations of unadjudicated, prior criminal acts inescapably will be accompanied and supported by evidence demonstrating the allegations occurred….In addition to the emotional testimony from an alleged victim of sexual abuse, therefore, a mountain of other evidence, extrinsic to the underlying criminal charges, is often necessary to establish the defendant committed the alleged, unadjudicated sexual abuse.

*Id.* at 739-40.  He asserted that trial courts "rarely should admit allegations of unadjudicated prior criminal offenses" because emotional testimony and "the inevitable mountain of evidence" needed to demonstrate whether the prior acts occurred "will always pose a danger of unfair prejudice that is likely to far exceed its probative value."

*Id.* at 741.  Judge Powell warned:

If courts choose to admit such evidence, the emotional characteristics of this evidence must somehow be contained.  In addition, the extrinsic and collateral evidence surrounding the alleged victim's testimony must, in some manner, be fairly limited, so the resulting confusion and unfair prejudice does not spin out of control and grow exponentially greater than the probative value.

*Id.*

Despite this case being tried before *Minor* was handed down, the propensity evidence was admitted in such a way to avoid the risks about which Judge Powell warned.  Although Propensity Witness 1 and Propensity Witness 2 testified live regarding the past unadjudicated incident, their testimony was brief and not overly emotional. "While the cold record cannot record all displays of emotion, the trial judge was in the

**18**

best position to determine whether any such displays created an unfair prejudice."
*Robinson*, 662 S.W.3d at 127. Furthermore, their limited testimony did not constitute "a trial within a trial." Other than their corroborating testimony and Billings's explanation about how the incident occurred, no other extrinsic or collateral evidence was presented. The evidence of unadjudicated prior acts was fairly limited to avoid confusion and unfair prejudice. *See Coyle*, 671 S.W.3d at 724-25; *Robinson*, 662 S.W.3d at 127-28 (dangers of unadjudicated prior bad acts Judge Powell warned of in *Minor* not present). The trial court did not abuse its discretion in admitting the testimony of Propensity Witness 1 and Propensity Witness 2.

Points one and two are denied.

## Point Three

In point three, Billings contends that the trial court plainly erred in failing to dismiss the venire panel following a venireperson's inflammatory and prejudicial outburst. Billings acknowledges that the issue was not preserved for review because he failed to object at the time of the venireperson's comments or request a dismissal of the venire panel and thus asks for plain error review.

Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review is a two-step inquiry. *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014). The court must first determine whether the claimed error is plain error affecting substantial rights. *Id.* "Substantial

rights are involved if, facially, there are significant grounds for believing that the error is of the type from which manifest injustice or miscarriage of justice could result if left uncorrected." *Id.* "An error is plain if it is evident, obvious, and clear." *Id.* (internal quotes and citation omitted). If plain error affecting substantial rights is found, the court then determines "whether the error actually did result in manifest injustice or a miscarriage of justice." *Id.*

During the defense's voir dire about the burden of proof, the following exchange occurred with Venireperson 29:

> Defense Counsel: And is there something you expect my client or myself to prove to you during the course of this trial?
>
> Venireperson [29]: Once you're considered a cho-mo you'll always be a cho-mo.
>
> Defense Counsel: Okay, but at this point he's not convicted of anything.
>
> Venireperson [29]: He's not convicted of it but he still a cho-mo. For everybody that doesn't understand, child molester.
>
> Defense Counsel: Thank you. Thank you for your honesty.

The defense requested no relief at the time or later (until the motion for new trial) but asked the trial court to strike Venireperson 29 for cause based on his statements, with no objection by the State. The trial court struck Venireperson 29 for cause.

"The defendant has the right to a fair and impartial jury." *State v. Staten*, 524 S.W.3d 186, 190 (Mo. App. W.D. 2017). "To qualify as a juror, the venireperson must be able to enter upon that service with an open mind, free from bias and prejudice. If a

juror cannot be fair and impartial, then the juror must be stricken." *Id.* (internal quotes and citation omitted). The disqualification of an individual juror for bias or expression of an opinion during voir dire is usually insufficient to challenge the entire venire panel. *State v. Evans*, 802 S.W.2d 507, 514 (Mo. banc 1991); *Staten*, 524 S.W.3d at 191; *Riley v. State*, 475 S.W.3d 153, 159 (Mo. App. E.D. 2014). To justify striking the entire panel, a movant must demonstrate that the venireperson's comments were so inflammatory and prejudicial that it can be said that the right to a fair trial has been infringed. *Evans*, 802 S.W.2d at 514; *Staten*, 524 S.W.3d at 190-91; *Riley*, 475 S.W.3d at 159.

Courts have found statements regarding the presumed guilt of a defendant similar to those made by Venireperson 29 were not so inflammatory and prejudicial as to taint the entire venire panel. *See Evans*, 802 S.W.3d at 514-15 (venireperson's statement "Everybody's got some kind of thought, what he did to this nine year old girl" did not inflame or prejudice the other venire members where venireperson was struck and trial court instructed jury to disregard the comments); *State v. Weidlich*, 269 S.W.2d 69, 71 (Mo. 1954) (venireman's comment during voir dire that "I don't think I can give a thief a fair trial" was not so inflammatory and prejudicial that it could be said defendant's right to fair trial had been infringed); *Riley*, 475 S.W.3d at 159-60 (denying ineffective assistance of counsel claim for lack of prejudice where two venirepersons stated that they knew defendant and his parents and already believed he was guilty without hearing evidence because comments not so inflammatory and prejudicial as to taint the panel); *Skipper v. State*, 209 S.W.3d 552, 555-56 (Mo. App. S.D. 2006) (denying ineffective

**21**

assistance of counsel claim for lack of prejudice where venire member's statements that she knew things from defendant's past and it would be hard to presume defendant was innocent were insufficient to taint the entire panel); *State v. Lacy*, 851 S.W.2d 623, 630-31 (Mo. App. E.D. 1993) (venire member's statement that he knew and had dealings with defendant and defendant's family, had a predetermined verdict, and could not be fair or impartial were not such as to inflame or prejudice the other members).

In this case, Venireperson 29 was struck for cause after his comments. Nothing in the record shows that any of the other venire members were biased or tainted by the statements of Venireperson 29. While several venirepersons expressed doubt about Billings's presumed innocence or that they could be impartial jurors based on their own or their family member's experience with sexual assault and were struck accordingly, no other panel members generally indicated that they could not follow the court's instructions or decide the case based solely on the evidence. Venireperson 29's comments were not so inflammatory or prejudicial as to taint the venire panel or infringe upon Billings's right to a fair trial. The trial court did not plainly err in failing to dismiss the panel.

Point three is denied.

## Point Four

In point four, Billings contends that the trial court plainly erred in imposing consecutive sentences under the mistaken belief that consecutive sentences were statutorily mandated by section 558.026, in violation of the prohibition of *ex post facto*

laws in the United States and Missouri constitutions.[4]  Specifically, he argues that the charged conduct of Count II was alleged to have occurred before the adoption of the mandatory consecutive sentences for multiple counts of first-degree statutory sodomy and that his consecutive sentences based on the trial court's mistaken belief of the available range of punishment was evident, obvious, and clear error resulting in manifest injustice.[5]

Billings was found guilty of two counts of statutory sodomy in the first degree for conduct that occurred between July 27, 2017, and July 27, 2018 (Count I) , and between April 7, 2009, and April 7, 2011 (Count II).  The jury recommended sentences of 12 years' imprisonment for each count.  At the sentencing hearing, the State argued for the maximum sentence of 12 years' imprisonment for each count to run consecutively for a total of 24 years' imprisonment based on the impact that the crimes had on the two young victims and on the entire family.[6]  The trial court asked, "Isn't it statutorily mandated to

---

[4] U.S. CONST. art. I, § 10; MO. CONST. art. I, § 13.

[5] While Billings asserts in his point relied on that the trial court violated the prohibition against *ex post facto* laws in sentencing him, and he sets out the general *ex post facto* principles in his argument, he does not develop an argument or cite cases to support an *ex post facto* claim. Instead, Billings's specific claim in his point relied on, his argument, and the cases he relies on, focus on a due process analysis.  *See State v. Cruz-Basurto*, 581 S.W.3d at 51, 60-61 (Mo. App. W.D. 2019) (defendant's appellate challenge to his sentences of consecutive terms of imprisonment for two counts of first-degree statutory sodomy did not allege *ex post facto* violation but instead a due process violation).  Failure to support a claim raised in a point relied on with authority and argument beyond conclusions results in abandonment of the claim. *State v. Soliben*, 621 S.W.3d 585, 594 n. 6 (Mo. App. S.D. 2021).

[6] The authorized range of punishment for the unclassed felony of statutory sodomy in the first degree where the victim is less than 12 years old is life imprisonment or a term of years not less than ten years.  § 566.062.062.2(1), RSMo 2016.  Because the jury assessed two 12-year terms of imprisonment, the maximum term that the trial court could have imposed was 12 years.  §

**23**

run consecutive?" and the prosecutor answered, "Yes, Judge[.]"  The defense argued for the minimum sentence of 10 years' imprisonment for each offense, and made no statement regarding whether the sentences were required to run consecutively.  The trial court sentenced Billings to 12 years' imprisonment on Count I and 12 years' imprisonment on Count II and stated that "those sentences are to run consecutively by statute."  Billings did not object to the sentences imposed by the trial court.  Because he failed to object to the sentences when they were imposed, this claim of error is not preserved for appellate review.  *State v. Cruz-Basurto*, 581 S.W.3d 51, 58 (Mo. App. W.D. 2019).  Accordingly, Billings requests plain error review under Rule 30.20 as set out in point three above.

"As a general rule, penalties imposed for the violations of criminal laws are to be governed by statutes in effect at the time of the commission of the crimes."  *Cruz-Basurto*, 581 S.W.3d at 60 (internal quotes and citation omitted).  The current version of section 558.026.1, RSMo Cum. Supp. 2021, which became effective on August 28, 2013, provides:

> 1. Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively; except in the case of multiple sentences of imprisonment imposed for any offense committed during or at the same time as, or multiple offenses of, the following felonies:
>
> (1) Rape in the first degree, forcible rape, or rape;

---

557.036.5, RSMo 2016 ("any term of imprisonment imposed [by the court] cannot exceed the term declared by the jury").

(2) Statutory rape in the first degree;

(3) Sodomy in the first degree, forcible sodomy, or sodomy;

(4) Statutory sodomy in the first degree; or

(5) Any attempt to commit any of the felonies listed in this subsection. In such case, the sentence of imprisonment imposed for any felony listed in this subsection or an attempt to commit any of the aforesaid shall run consecutively to the other sentences. The sentences imposed for any other offense may run concurrently.

The version of the statute in effect prior to August 28, 2013, provided:

Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively; except that, in the case of multiple sentences of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid and for other offenses committed during or at the time as that rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid, the sentences of imprisonment imposed for the other offenses may run concurrently, but the sentence of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid shall run consecutively to the other sentences.

§ 558.026.1, RSMo 2000. In *Williams v. State*, 800 S.W.2d 739, 740 (Mo. banc 1990), the Missouri Supreme Court found that this prior version of section 558.026.1 was ambiguous in its application in cases involving multiple convictions of the listed offenses. *Cruz-Basurto*, 581 S.W.3d at 59. The Court addressed the ambiguity by declaring that trial courts must be afforded "maximum discretion" to order sentences on multiple convictions of the listed offenses (which include first-degree statutory sodomy) to run either concurrently or consecutively. *Williams*, 526 S.W.3d at 740; *Cruz-Basurto*, 581 S.W.3d at 59.

**25**

Billings argues that because the Count II conduct occurred before the 2013 amendment to section 558.026.1, the trial court was vested with discretion to run the sentences concurrently but plainly erred in sentencing him under the mistaken belief that it was compelled by the statute to impose consecutive sentences. He cites *State v. Tillitt*, 552 S.W.3d 571 (Mo. App. W.D. 2018), to support his argument. In *Tillitt*, the defendant was convicted of five counts of first-degree statutory sodomy and one count of first-degree child molestation for conduct that occurred prior to the 2013 amendment to section 558.026.1. *Id.* at 576, 581. At the sentencing hearing, both the prosecution and the defense advised the trial court that the defendant's sentences for the statutory sodomy convictions were required to run consecutively to one another under section 558.026.1. *Id.* at 576. After taking a recess, the trial court expressed its understanding of the statute: "Thank you everyone. Please be seated. Okay, so I've been trying to understand the legislative reasoning for consecutive sentences. And once I sort of opened my mind to it it kind of makes sense." The court then sentenced the defendant to consecutive terms of imprisonment on all six counts. *Id.* The defendant appealed, asserting that the trial court plainly erred in imposing consecutive sentences. *Id.* at 581.

On appeal, this court explained that the statute in effect at the time of the defendant's conduct afforded the trial court discretion to impose either consecutive or concurrent terms of imprisonment for her convictions of the offenses listed in section 558.026.1. *Id.* at 581-82. It determined that "the court, the prosecutor, and defense counsel all agreed and stated on the record that the sentences for multiple convictions of

first-degree statutory sodomy were required under the law to run consecutively." *Id.* at

582. Because this court determined that the trial court had based its sentencing of the

defendant on a mistaken belief regarding the possible range of punishment, the case was

remanded for re-sentencing.[7] *Id.*

Subsequent to the *Tillitt* decision, the Missouri Supreme Court clarified the burden

that a criminal defendant must carry to demonstrate manifest injustice based on a

sentencing court's possible misunderstanding of the appropriate range of punishment in

two cases handed down the same day: *State v. Pierce*, 548 S.W.3d 900 (Mo. banc 2018)

and *State v. Perry*, 548 S.W.3d 292 (Mo banc 2018). In *Pierce*, at the sentencing

hearing, the trial court stated its mistaken belief regarding the range of penalties for an

---

[7] In *Tillitt*, our court focused primarily on whether the trial court erred in concluding that the sentences were required to run consecutively, and simply cited *State v. Williams*, 465 S.W.3d 519 (Mo. App. W.D. 2015), for the proposition that such error was necessarily plain error that required remand for resentencing: "A sentence passed on the basis of a materially false foundation lacks due process of law…[t]his is so, even if it is likely the court will return the same sentence." *Tillitt*, 552 S.W.3d at 582 (quoting *Williams*, 465 S.W.3d at 520).

Subsequent to *Tillitt*, in *State v. Pierce*, 548 S.W.3d 900 (Mo. banc 2018), and in *State v. Perry*, 548 S.W.3d 292 (Mo. banc 2018), the Missouri Supreme Court specifically addressed the lens of plain error review where it is apparent the sentencing court held a mistaken belief regarding sentencing, and specifically distinguished *Williams* (where the sentencing court had imposed what it mistakenly believed to be the minimum sentence) from cases where the sentencing court had imposed sentences that exceeded what it believe was the minimum required sentence and did not necessarily impose its sentence based on that belief. *Pierce*, 548 S.W.3d at 904-906; *Perry*, 548 S.W.3d at 301. In *Tillitt*, the trial court did, in fact, sentence above what it wrongly believed the minimum combined sentences would be (as did the trial court in the case at hand); and our court nevertheless found plain error, applying a standard of review for plain error (*Williams*) that has been subsequently modified by the Supreme Court (in *Pierce* and *Perry*) as further discussed in this point.

enhanced felony (that it was 10 to 30 years, whereas the range was actually 5 to 30 years). 548 S.W.3d at 903-04. The prosecutor indicated that they had agreed to recommend a "lid" of 20 years. *Id.* at 902. The trial court imposed a sentence of 15 years, and offered an explanation why it imposed the sentence. *Id.* No objection was made at the sentencing hearing regarding the trial court's misunderstanding of the range of penalties. *Id.* In his appeal, Pierce claimed that the trial court plainly erred in imposing the sentence, in that it was based on a mistaken belief as to the range of penalties. *Id.* at 903-04. In affirming the trial court, the Supreme Court explained, "A sentence passed on the basis of a materially false foundation lacks due process of law and entitles the defendant to a reconsideration of the question of punishment in the light of the true facts, regardless of the eventual outcome." *Id.* at 904 (quoting *Wraggs v. State*, 549 S.W.2d 881, 884 (Mo. banc 1977)). Under plain error review, however, it is not enough to show that the trial court *held* a mistaken belief with respect to the range of punishment, the defendant must demonstrate manifest injustice or a miscarriage of justice by making a "case-specific showing" that the trial court imposed sentence *based* on that mistaken belief. *Id.* at 904-906. The Supreme Court held that because the record showed that the sentence was based on valid considerations, including that the defendant might reoffend and abuse other children, and there was no indication that the sentence was based on a misapprehension of the applicable law, the defendant failed to make a case-specific showing that he was sentenced based on the court's mistaken belief. *Id.* at 906. It noted that the trial court had, in fact, imposed a sentence above what it mistakenly

**28**

believed was the minimum period of incarceration. *Id.* at 906 n. 5.

In *State v. Perry*, the prosecutor stated the incorrect range of incarceration on an enhanced felony (5 to 15 years, whereas it was actually one year in jail to 15 years' incarceration), defense counsel agreed, and the trial court assented to the wrongly stated range of incarceration. 548 S.W.3d at 297, 300. The prosecutor requested an eight-year sentence, which was, without comment, imposed by the trial court. *Id.* at 297. In his appeal, Perry claimed the trial court plainly erred in imposing the eight-year sentence, based on its misunderstanding of the range of incarceration. *Id.* at 300. In affirming the trial court, the Supreme Court concluded that Perry, "who [bore] the burden of establishing manifest injustice as determined by the facts and circumstances of the case, has failed to meet his burden." *Id.* at 301 (internal quotes and citation omitted). Unlike in *Pierce*, the Supreme Court in *Perry* did not rely upon additional comments by the trial court as to why it imposed the eight-year term of incarceration. Rather, in *Perry*, the Supreme Court indicated:

> The [trial] court did not sentence Perry to the misstated minimum sentence; instead, it sentenced him to an even longer sentence. Indeed, the eight-year sentence was precisely what the prosecutor recommended….

> Consistent with *Pierce*, Perry has failed to make a case-specific showing that he was sentenced based on the circuit court's mistaken belief. Accordingly, the circuit court did not err in sentencing him to eight years' imprisonment.

*Id.* (internal citation omitted).

More recently, the Eastern District of our court, in *State v. Heidbrink*, 670 S.W.3d 114, 132 (Mo. App. E.D. 2023), rejected the defendant's claim of plain error based upon

**29**

the trial court's misapprehension of the range of penalties on an enhanced felony. As in *Perry*, in *Heidbrink*, the prosecutor misstated the range of incarceration; and the trial court explicitly adopted the incorrect range of incarceration, and, without comment, imposed the sentence recommended by the prosecutor, which was above the misunderstood minimum sentence. *Id.* Citing *Perry*, the *Heidbrink* court concluded that the defendant had failed to meet her burden to prove plain error, specifically, in failing to prove that the trial court imposed its sentence based upon its misunderstanding of the range of incarceration. *Id.*[8]

In this matter, as in *Perry* and *Heidbrink*, the trial court had a misunderstanding regarding its sentencing options, but, without comment, did not impose what it understood to be the minimum sentences available (in this matter, two consecutive 10-year sentences). Instead, it imposed the sentences requested by the prosecuting attorney (two consecutive 12-year sentences). While the mistaken understanding in this matter (not knowing the ability to sentence concurrently) differs from the mistaken understanding in *Pierce*, *Perry*, and *Heidbrink* (not understanding the low end of the

---

[8] *See also State v. Spradling*, 633 S.W.3d 494, 502 (Mo. App. S.D. 2021) (even if trial court erroneously believed that minimum sentence for armed criminal action was 10 years, record did not demonstrate that court sentenced defendant based on the mistaken belief where court imposed 12-year sentences for ACA offenses, which were more than defense but less than the prosecutor recommended and there was no indication that court intended to impose the minimum required sentence); *Cruz-Basurto*, 581 S.W.3d at 62 (defendant failed to show that trial court's mistaken belief that it was statutorily required to impose consecutive sentences on two counts of first-degree statutory sodomy for charged conduct spanning the date section 558.026.1 was amended constituted evident, obvious, and clear error where evidence presented at trial provided a sufficient factual basis from which jury could have found that the charged conduct occurred after the effective date of the statute's amendment).

range of incarceration), the principle is the same. In plain error review, the defendant must make a case-specific showing, not only that the sentencing court had a mistaken understanding of its sentencing options, but that the court then based its sentence on that mistaken understanding. Here, as in *Perry* and *Heidbrink*, the trial court declined to impose what it understood to be the minimum combined sentences and what the defense requested and instead imposed the sentences recommended by the prosecutor—sentences that were, in this matter, the maximum it could impose given the jury's recommendation.

The trial court did not provide a reason for imposing a sentence above the minimum argued by the defense. Nor was it required to do so. Had the trial court been inclined towards leniency, it could have imposed what it understood to be the minimum (two consecutive ten-year sentences). Instead, it imposed exactly what the prosecutor requested, the maximum sentences available, given the jury's recommendation. Nothing in the record suggests it would have run the sentences concurrently had it understood that was an option. As in *Pierce*, *Perry*, and *Heidbrink*, Billings has failed to make a case-specific showing that he was sentenced *based* on the trial court's mistaken belief.

Even if the trial court's misunderstanding of its sentencing options provided "significant grounds for believing that the error is of the type from which manifest injustice or miscarriage of justice *could* result if left uncorrected" (the first step of plain error analysis), Billings has failed to make the case-specific showing that the error "actually did result in manifest injustice or a miscarriage of justice" (the second step of plain error analysis). *Hunt*, 451 S.W.3d at 260 (emphasis added). Accordingly, the trial

court did not plainly err in imposing consecutive sentences.

Point four is denied.

## Point Five

Finally, in point five, Billings asserts that the trial court plainly erred in submitting Instruction No. 8, the verdict director for Count I (first-degree statutory sodomy involving Victim 1), in violation to his right to a unanimous verdict. He argues that the State produced evidence and argument as to at least two distinct criminal acts within the charging period and the verdict director neither specified an individual act nor directed the jury to unanimously agree on guilt for a particular act.

Billings acknowledges that he did not object to the verdict director and requests plain error review. The defendant bears the burden of proving that instructional error had produced manifest injustice or a miscarriage of justice. *State v. Adams*, 571 S.W.3d 140, 145 (Mo. App. W.D. 2018). "For instructional error to constitute plain error, the defendant must demonstrate the trial court so misdirected or failed to instruct the jury that the error affected the jury's verdict." *State v. Celis-Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011) (internal quotes and citations omitted).

The trial court submitted Instruction No. 8, which instructed the jury on Count I for statutory sodomy committed against Victim 1. The verdict director read:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that between July 27, 2017 and July 27, 2018, in the State of Missouri, defendant moved his hand toward [Victim 1's] vagina and tried

**32**

to touch her vagina with his hand, and

Second, that such conduct was a substantial step toward the commission of the offense of statutory sodomy in the first degree, and

Third, that defendant engaged in such conduct for the purpose of committing such statutory sodomy in the first degree,

Then you will find the defendant guilty under Count I of statutory sodomy in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

A person commits the crime of statutory sodomy in the first degree if he or she knowingly has deviate sexual intercourse with another person who is less than twelve years of age.

Article I, section 22(a) of the Missouri Constitution guarantees the right to a unanimous jury verdict in a criminal trial. *Celis-Garcia*, 344 S.W.3d at 155; *State v. Gibbons*, 629 S.W.3d 60, 75 (Mo. App. W.D. 2021); *Adams*, 571 S.W.3d at 145. "For a jury verdict to be unanimous, the jurors must be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt." *Celis-Garcia*, 344 S.W.3d at 155 (internal quotes and citations omitted). The issue of jury unanimity is particularly implicated in multiple act cases. *Gibbons*, 629 S.W.3d at 75; *Adams*, 571 S.W.3d at 145. "A multiple acts cases arises where there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those in a single count." *Gibbons*, 629 S.W.3d at 75 (quoting *Celis-Garcia*, 344 S.W.3d at 155-56). "In multiple acts cases, the possibility exists that jurors follow the

trial court's instructions, yet individually choose differing instances of the crime on which they base the conviction, violating the defendant's right to a unanimous jury verdict." *State v. Brown*, 614 S.W.3d 5, 11 (Mo. App. E.D. 2020) (internal quotes and citations omitted). To protect the right to a unanimous verdict in a multiple acts case, either (1) the prosecutor elects a particular criminal act with which to support the charge, to the exclusion of other criminal acts, or (2) the verdict director specifically describes the separate criminal acts presented to the jury and the jury is instructed that it must agree unanimously that at least one of those acts occurred. *Celis-Garcia*, 344 S.W.3d at 157.

Billings argues that this is a multiple acts case because the State argued and presented evidence that Billings had inappropriately touched Victim 1 in both the bedroom and the bath, either one of which would have supported the charged offense, and that the verdict director made it impossible to determine whether the jury unanimously agreed on one of the separate incidents.

This was not a multiple acts case. The evidence revealed only one distinguishable incident of Billings attempting to touch Victim 1's vagina with his hand in the time period set out in the verdict director (between July 27, 2017, and July 27, 2018), which covered the period when Victim 1 was five years old. Victim 1 generally disclosed to the forensic interviewer that Billings tried to touch her "private" more than one time and that she was five years old when Billings first "tried to touch me in inappropriate places." She specifically described an incident when Billings put his hand on her private on top of her clothes while they were watching TV on Billings's bed. Victim 1 even demonstrated

the positions that they were in on the bed when the attempted touching happened.

Contrary to Billings' argument, the evidence did not disclose any attempted touching in the bath. While the State anticipated in its opening statement that the evidence would show that Victim 1 disclosed touching in the bathtub to her sister, her sister ultimately did not testify that Victim 1 identified any specific locations where the touching had occurred. In closing argument, the State mistakenly repeated that Victim 1's sister testified that Victim 1 told her that Billings touched her when bathing her, but Billings did not object to the argument even though the argument was not supported by the evidence. The statements made by the prosecutor during opening statement and closing argument are not evidence to be considered by the jury *Johnson v. State*, 406 S.W.3d 892, 906 (Mo. banc 2013) ("Closing argument by the attorneys is not evidence to be considered by the jury." (internal quotes and citation omitted)); *State v. McFadden*, 369 S.W.3d 727, 747 (Mo. banc 2012) ("An opening statement is not evidence.").

The only evidence offered at trial regarding Victim 1 in the bath came from Billings's police interview and the forensic interviewer. Billings told Detective that he had bathed Victim 1 on many occasions. When asked about her understanding of why Victim 1 came in for a forensic interview, the interviewer testified, "The allegations we received indicated that she had made a disclosure that her uncle had touched her on her private. At least the referral also indicated about that individual giving her at [sic] bath." The forensic interviewer further testified that she did not question Victim 1 about any incidents that may have happened in the bath because she did not want to introduce any

**35**

specific event, that Victim 1 never discussed the bath, and that she (the interviewer) was not surprised that the subject did not come up. This evidence from the police interview and the forensic interviewer did not reveal another distinct incident of touching that took place in the bath. As such, Instruction No. 8, the verdict director for Count I, "did not implicate [Billings's] right to a unanimous verdict because the evidence did not describe multiple, distinct acts, any one of which could have supported a finding of guilt." *Adams*, 571 S.W.3d at 150. Instruction No. 8 did not evidently, obviously, or clearly affect Billings's right to a unanimous verdict. The trial court did not plainly err in submitting it to the jury.

Point five is denied.

## Conclusion

Billings's motion to find the notice of appeal timely filed (WD85545), which was taken with the case, is denied as moot. The judgment is affirmed.

_____
Thomas N. Chapman, Presiding Judge

All concur.

36